**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| IN RE SCIENTIFIC-ATLANTA, | : | CIVIL ACTION NO. |
| INC. SECURITIES LITIGATION | : | 1:01-CV-1950-RWS |
| | : | |
| | : | |

## ORDER

This case is presently before the Court for consideration of Plaintiffs'

Motion for Class Certification [151].  After considering the entire record, the

Court enters the following Order.

### Background

This is a consolidated securities fraud class action brought under Sections

$10(b)^1$ and $20(a)^2$ of the Securities Exchange Act of 1934 (the "Exchange Act"),

---

[1] Section 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by
> the use of any means or instrumentality of interstate
> commerce or of the mails, or of any facility of any national
> securities exchange . . .  [t]o use or employ, in connection
> with the purchase or sale of any security registered on a
> national securities exchange or any security not so
> registered, . . . any manipulative or deceptive device or
> contrivance in contravention of such rules and regulations as

15 U.S.C. §§ 78j and 77t, and Rule 10b-5 promulgated by the Securities and

Exchange Commission, 17 C.F.R. § 240.10b-5.[3]  Plaintiffs seek to maintain a

class of individuals who purchased or otherwise acquired the securities of

Defendant Scientific-Atlanta, Inc. ("SA"), or who sold put options of SA

between January 18, 2001 and August 16, 2001 (the "Class").[4]  Plaintiffs

---

the Commission may prescribe as necessary or appropriate
in the public interest or for the protection of investors.

15 U.S.C. § 78j.

[2] Section 20(a) of the Exchange Act imposes liability on "controlling persons" who aid and abet "any person liable under any provision of this chapter or of any rule or regulation thereunder."  15 U.S.C. § 78t; <u>see</u> <u>generally</u> <u>Garfield v. NDC Health Corp.</u>, 466 F.3d 1255, 1261 (11th Cir. 2006).

[3] Rule 10b-5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange.
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

[4] Excluded from Plaintiffs' proposed class are Defendants, the officers and directors of Scientific-Atlanta, any entity in which Defendants or any excluded person

propose as class representatives Alexander Peterson, Hugh G. Peterson, III,

Jack Graeber, Roger Hale, and Vigilant Investors LP.  Defendants in this action

are Scientific-Atlanta, Inc., and SA's CEO and CFO during the class period,

Wallace G. Haislip and James F. McDonald, respectively.[5]

The specific facts of this case as alleged by Plaintiffs are fully set forth in

the Court's Order denying Defendants' Motion to Dismiss.  (See Order of Dec.

23, 2002 [49] at 1-10.)  In brief, Plaintiffs allege that Defendants engaged in

pervasive "channel stuffing"[6] and utilized improper accounting practices

between January and June of 2001 in an effort to hide decreasing demand for

SA products and decreasing sales to SA customers.  Plaintiffs further allege that

during this period, SA intentionally misrepresented to investors that demand for

SA products was increasing, when in fact it was in decline.  Through this

combination of channel-stuffing, improper accounting, and misleading

_____

had a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

[5] Plaintiffs allege that the individual defendants are liable for SA's violations as "controlling persons" of SA under § 20(a) of the Exchange Act.  15 U.S.C. § 78t(a).

[6] "Channel stuffing is a practice whereby a company floods distribution channels by employing incentives to induce customers into purchasing their products in large quantities, creating a short-term bump in revenue and excess supply in the distribution chain."  Garfield, 466 F.3d at 1260 n.1.  While channel stuffing is not fraudulent per se, it may amount to fraudulent conduct when it is done with the intent of misleading investors.  Id. at 1261-62.

statements, SA, according to Plaintiffs, gave the false appearance that it was gaining market share and performing better than its competitors during a period of decline.  The end effect was an artificial inflation of the price of SA stock.

Plaintiffs further allege that Defendants' fraudulent acts in the first half of 2001 were, at least in part, revealed in July of 2001.  On July 19, 2001, in a statement issued after the close of the New York Stock Exchange, Defendants for the first time disclosed that demand for SA's products was, despite their earlier statements, decreasing.  Defendants also disclosed that SA had not met its revenue forecasts and earnings expectations for fiscal year 2001, and informed investors that SA would reduce its prior earnings forecasts for the first quarter of fiscal year 2002.  The next day, the price of SA stock fell over 35%, from its July 19, 2001 close of $35.08 per share to $22.80 per share, resulting in a market capitalization loss of approximately $2 billion.  More than 27 million shares of SA stock changed hands, representing over ten times the stock's average daily trading volume.

Finally, Plaintiffs allege that the full extent of Defendants' fraud was revealed several weeks later, on August 16, 2001, when Defendants filed, after the close of trading, their fiscal year 2001 Form 10-K.  In that filing, and in concurrently issued press releases, Defendants withdrew their previous earnings

4

guidance for all of fiscal year 2002, citing in part the declining demand for SA products by cable service providers.  SA also announced significant decreases in sales, bookings, and inventory.  Following these disclosures, the price of SA stock declined 15%, from its August 16, 2001 close of $25.01 to $21.24 per share on August 17, 2001, which resulted in a market capitalization loss of more than $589 million.

Plaintiffs initially filed this action on July 24, 2001, and filed their amended consolidated complaint on January 31, 2002.  Plaintiffs have since moved pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) to certify a proposed class consisting of all persons who purchased or otherwise acquired the securities of SA, or who sold put options of SA between January 18, 2001, and August 16, 2001.  Defendants oppose certification on three principal grounds: (1) Plaintiffs have not satisfied the typicality and adequacy of representation requirements of Rule 23(a); (2) Plaintiffs have not established that common issues of law or fact predominate as required by Rule 23(b)(3); and (3) the proposed class definition is overinclusive.

For the reasons that follow, the Court concludes that class certification is warranted.

**Discussion**

Rule 23 of the Federal Rules of Civil Procedure establishes the criteria for certifying a case as a class action.  Specifically, a class action may be maintained only when it satisfies all the requirements of Fed. R. Civ. P. 23(a) and at least one of the alternative requirements of Rule 23(b).  Rutstein v. Avis Rent-A-Car Sys. Inc., 211 F.3d 1228, 1233 (11th Cir. 2000).  The party seeking class certification bears the burden of establishing that the requirements of Rule 23 have been satisfied.  Id.

In determining whether class certification is proper, the Court is required to conduct a "rigorous analysis" of the prerequisites of Rule 23.  See, e.g., Beck v. Maximus, Inc., 457 F.3d 291, 297 (3d Cir. 2006); Elizabeth M. v. Montenez, 458 F.3d 779, 784 (8th Cir. 2006); Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 318 (4th Cir. 2006); Unger v. Amedisys Inc., 401 F.3d 316, 320 (5th Cir. 2005).  While the likelihood of the plaintiffs' success on the merits is not a relevant consideration, see Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974), the Court is not limited to the pleadings.  Rather, it must "take a close look at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of certification."  Thorn, 445 F.3d at 319 (quotations omitted).  In taking this

AO 72A
(Rev.8/82)

close look, it is appropriate for the Court to "consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." Valley Drug Co. v. Geneva Pharm., Inc., 350 F.3d 1181, 1188 n.15 (11th Cir. 2003).

Under that guidance, the Court addresses the following issues: (1) whether Plaintiffs have established the requirements for class certification with respect to both (a) individuals who purchased or otherwise acquired shares of SA stock during the class period and (b) individuals who sold put options of SA during the class period; and (2) assuming that Rule 23 has been satisfied with respect to one or more of the above groups, whether Plaintiffs have proffered an appropriate class definition.

## I.      Rule 23(a)

Rule 23(a) provides:

> One or more members of a class may sue or be sued
> as representative parties on behalf of all only if (1) the
> class is so numerous that joinder of all members is
> impracticable, (2) there are questions of law or fact
> common to the class, (3) the claims or defenses of the
> representative parties are typical of the claims or
> defenses of the class, and (4) the representative parties
> will fairly and adequately protect the interests of the
> class.

Fed. R. Civ. P. 23(a).  The four prerequisites of Rule 23—numerosity,

commonality, typicality, and adequacy of representation—"are designed to limit class claims to those fairly encompassed by the named plaintiffs' individual claims." Piazza v. Ebsco Indus., Inc., 273 F.3d 1341, 1346 (11th Cir. 2001) (quotation and citation omitted).  In doing so, the requirements of Rule 23(a) ensure that "the common bond between the class representatives' claims and those of the class is strong enough so that it is fair for the fortunes of the class members to rise or fall with the fortunes of the class representatives." Cooper v. Southern Co., 390 F.3d 695, 713 (11th Cir. 2004) (quotations omitted).

### A.    Numerosity

To satisfy the numerosity requirement, Plaintiffs must establish that the members of the proposed class and subclass are so numerous that joinder of all members is impracticable.  Fed. R. Civ. P. 23(a).  In order to demonstrate numerosity, plaintiffs need not prove that joinder is impossible; rather, plaintiffs "need only show that it would be extremely difficult or inconvenient to join all members of the class." Anderson v. Garner, 22 F. Supp. 2d 1379, 1384 (N.D. Ga. 1997).  Courts have considered several factors in determining the practicability of joinder, including the size of the class, the ease of identifying its numbers and determining their addresses, the facility of making service on them if joined, and their geographic dispersion. Kilgo v. Bowman Transp., Inc.,

8

789 F.2d 859, 878 (11th Cir. 1986).  Moreover, in federal securities fraud cases, "[n]umerosity is generally presumed when a claim involves nationally traded securities."  In re Theragenics Corp. Securities Litig., 205 F.R.D. 687, 694 (N.D. Ga. 2002); Zeidman v. J. Ray McDermott & Co., Inc., 651 F.2d 1030, 1039 (5th Cir. July 27, 1981).

Defendants do not dispute that the proposed class satisfies Rule 23(a)'s numerosity requirement.  At all relevant times, SA was traded on the New York Stock Exchange.  During this period, approximately 387 million shares of SA stock were traded on the open market.  Given the multitude of traders of SA stock during the class period, the Court finds that joinder would be impracticable.  Plaintiffs have therefore satisfied the numerosity requirement.

**B.      Commonality and Typicality**

The typicality and commonality prerequisites of Rule 23 are "distinct but interrelated."  Cooper, 390 F.3d at 713. "Traditionally, commonality refers to the group characteristics of the class as a whole, while typicality refers to the individual characteristics of the named plaintiffs in relation to the class." Piazza, 273 F.3d at 1346.  Both prerequisites, however, share the common purpose of requiring that "a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members to

9

warrant class certification."  Id.  To prove a sufficient nexus of claims,

Plaintiffs must demonstrate that their claims  "share the same essential

characteristics as the claims of the class at large."  Cooper, 390 F.3d at 714.

      1.   Commonality

The commonality requirement of Rule 23(a)(2) requires one or more

"questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).

"Under the Rule 23(a)(2) commonality requirement, a class-action must involve

issues that are susceptible to class-wide proof."  Murray, 244 F.3d at 811;

Cooper, 390 F.3d at 714.  "While not entirely dissimilar to the typicality

requirement, Rule 23(a)'s commonality requirement measures the extent to

which all members of putative class have similar claims."  Cooper, 390 F.3d at

714.

Defendants do not dispute that Plaintiffs have satisfied the commonality

requirement of Rule 23, and the Court readily finds the commonality prong met

in this case.  Plaintiffs allege that Defendants made a series of false or

misleading statements during the class period which operated to artificially

inflate or maintain the price of SA stock to the detriment of investors.  Common

questions of law and fact therefore include: (1) whether Defendants violated the

Exchange Act and Rule 10b-5; (2) whether Defendants intentionally misled

investors regarding its business and business prospects between January and June of 2001; (3) whether the market price of SA stock was artificially inflated during the relevant period due to the alleged material misrepresentations and omissions; and (4) whether members of the proposed Class have suffered damages as a result.  Plaintiffs have therefore demonstrated commonality.

      2.   <u>Typicality</u>

To be typical, "[a] class representative must possess the same interest and suffer the same injury as the class members."  <u>Cooper</u>, 390 F.3d at 713 (quoting <u>Murray v. Auslander</u>, 244 F.3d 807, 811 (11th Cir. 2001)).  The Eleventh Circuit has explained the typicality requirement as follows:

> [T]here must be a nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class.  A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.  Typicality, however, does not require identical claims or defenses.  A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class.

<u>Kornberg v. Carnival Cruise Lines, Inc.</u>, 741 F.2d 1332, 1337 (11th Cir. 1984).

AO 72A
(Rev.8/82)

The Fifth Circuit has more recently emphasized that the test for typicality "is not demanding."  <u>Stirman v. Exxon Corp.</u>, 280 F.3d 554, 562 (5th Cir. 2002) (quotations omitted).  Rather,

> the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class.  If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality.

<u>Id.</u>; <u>see also</u> <u>Murray</u>, 244 F.3d at 811 ("The typicality requirement may be satisfied despite substantial differences . . . when there is a 'strong similarity of legal theories.' " (quoting <u>Appleyard v. Wallace</u>, 754 F.2d 955, 958 (11th Cir. 1985))).

         a.      <u>The Class Representatives' Claims are Typical of Post-July 19, 2001 Purchasers</u>

Defendants contend that the claims of the proposed class representatives are factually different from those of other members of the proposed class, and thus, Plaintiffs have failed to satisfy the typicality requirement of Rule 23(a)(3). Specifically, Defendants argue that, because all of the proposed class representatives purchased their shares of SA stock prior to the July 19, 2001 disclosure, these individuals, unlike those individuals who purchased after that disclosure, do not have to prove that the July 19, 2001 disclosure was itself

fraudulent, or that other actionable misstatements were made between July 19 and August 16, 2001.  Defendants also argue that post-July 19 purchasers are subject to several unique reliance-based defenses that do not apply to pre-July 19 purchasers, and as such, the claims of the proposed class representatives fail to satisfy the typicality requirement.

The Court is not convinced that the claims of the named class representatives are rendered atypical merely because they purchased their shares of SA stock prior to the alleged curative disclosure of July 19, 2001. Plaintiffs, as a class, allege that Defendants issued a series of false or misleading statements in the first half of 2001 (all prior to the July 19, 2001 disclosure) that had the effect of shielding declines in demand for SA's products from the market and artificially inflating the market price for SA stock.  They further allege that they relied on the integrity of the market, which incorporated these misstatements, in purchasing or acquiring SA stock during the class period, both before and after the July 19, 2001 partial curative disclosure.  Finally, they allege that they suffered a loss as a result of Defendants' misrepresentations when the truth regarding Defendants misrepresentations made in the first half of 2001 was revealed through both the July and August disclosures.  Because the claims of the named class

13

representatives rely on the same allegations of misrepresentations and

omissions and share the same legal theory as those of the class they seek to

represent, they have established the requisite typicality under Rule 23(a)(3).

In contesting typicality, Defendants attempt to recast the legal theory of

post-July 19th stock purchasers as relying exclusively on alleged

misrepresentations contained in Defendants' July 19th disclosure.  A review of

Plaintiffs' Complaint, however, makes clear that such an allegation is not

essential to the claims of post-July 19th purchasers.  As stated above, the thrust

of the allegations of both pre- and post-July 19th stock purchasers concern

Defendants' misrepresentations, channel-stuffing activities, and improper

accounting occurring during the first half of 2001.  While Plaintiffs assert in

their class certification papers that the July 19th disclosure was itself materially

misleading—because it only partially revealed the extent of Defendants' prior

fraud—it does not follow that proof that this statement constituted a material

misrepresentation is an "essential characteristic" of the claims of the post-July

19th purchasers.  See Stirman, 280 F.3d at 562.  Fairly construed, Plaintiffs

allege that the July 19th disclosure, to the extent that it did not fully reveal the

truth concerning Defendants' earlier fraudulent conduct, was a continuation of

the fraud occurring between January and June of 2001 that inflated the price

that both pre- and post-July 19th purchasers paid for SA stock.  Thus, because the claims of both pre- and post-July 19th purchasers arise from the same "pattern or practice" of alleged fraud occurring between January and June of 2001 and rely on the same legal theory, they share a sufficient nexus to establish typicality.  See Kornberg, 741 F.2d at 1337.

The Court also declines to find the claims of the proposed class representatives atypical because certain class members may be subject to unique reliance-based defenses separate and apart from those of the class representatives.   It is certainly true that a defense which is unique to the class representative and which has the potential to become "the focus of the litigation" may suffice to destroy typicality.  See, e.g., Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990); see also 5 Moore's Federal Practice § 23.24[5] ("Typicality will not be present if the class representative's claim is subject to one or more unique defenses that likely will be central to the litigation.  A unique defense that is central to the litigation precludes a finding of typicality because of the danger that the unique defense will preoccupy the class representative to the detriment of the interests of absent class members.") (citations omitted).  In such a situation, there is a danger that the absent class members will be harmed if their

15

representatives are preoccupied with their own, unique defenses.  Gary Plastic, 903 F.2d at 180.  But Defendants, in briefs which are notably devoid of citations on this issue, have pointed the Court to no authority indicating that the presence of a possible defense to the claims of some fraction of the non-representative class members is sufficient to preclude a finding of typicality.[7] Moreover, having reviewed the filings, the Court is not convinced that a reliance-based defense as to post July-19 purchasers will likely be central to the litigation.  Accordingly, the Court declines to find the possible unique defenses waged against post-July 19, 2001 purchasers sufficient to destroy typicality.

b.      The Class Representatives' Claims are Not Typical of Purchasers who Sold their Shares Prior to July 19, and the Class Definition Will Exclude Those Individuals

Defendants argue that any class certified by this Court should not be defined to include the subset of investors who *sold* their SA stock prior to the

---

[7] The Court, through its own research, is aware that the Seventh Circuit has in the past suggested that "the presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation." J.H. Cohn & Co. v. American Appraisal Assoc., Inc., 628 F.2d 994, 999 (7th Cir. 1980). Nevertheless, the Seventh Circuit has since retreated from that position, more recently holding that the mere possibility of defenses against the claims of certain class members does not defeat typicality.  See Wagner v. NutraSweet Co., 95 F.3d 527, 534 (7th Cir. 1996) ("Typicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members.").

AO 72A
(Rev.8/82)

July 19, 2001 partial curative disclosure because Plaintiffs have not alleged that any curative disclosure occurred prior to that date.[8]  In this respect, Defendants take the position that, as to these pre-July 19 sellers, Plaintiffs have failed to allege loss causation under the Supreme Court's decision in <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005), and thus have no claim as a matter of law.  Plaintiffs offer little on this point, and limit the response to a single footnote in which they assert that Defendants' "proposal is[] surplusage" because "[a] person who purchased and sold SA stock prior to the July 19 announcement and did not suffer a loss would necessarily be excluded from the class."  (Reply at 24.)

The allegations of Plaintiffs' Complaint center entirely around Defendants' alleged false and misleading statements which shielded declines in the demand for SA's products from the market, and the resulting loss that occurred when Defendants revealed the truth in their curative disclosures of July and August of 2001.  Defendants are correct that there is simply nothing in the Complaint which could fairly be read as alleging loss causation in support

---

[8] Defendants cast this argument in the section of their brief arguing that the class definition is overbroad.  Nevertheless, the Court considers the inclusion of the putative subclass of pre-July 19th sellers as it relates to the typicality prong of Rule 23.

of the claims of individuals who sold all shares of SA stock prior to the July 19,

2001 curative disclosure.

The likelihood that class members will prevail on the merits is not at

issue on a motion for class certification. See Eisen, 417 U.S. at 178.

Nevertheless, the absence of any allegation or arguable legal basis for the

claims of this small subset of SA stockholders, who sold their shares prior to

July 19, 2001, convinces this Court that the claims of the class

representatives—all of which rely on a unified theory of loss causation

occurring in July and/or August of 2001—are not typical of those proposed

class members who sold their shares of SA stock prior to those two curative

disclosures.  The claims and legal theories of the purchasers who bought shares

of SA stock during the class period but sold all of their shares prior to July 19,

2001, are significantly distinct from purchasers who purchased or retained their

shares through and after July 19, 2001.  The former have not arguably alleged a

curative disclosure as required to prove loss causation.  In view of this failing,

the Court concludes that the claims of the class representatives—which *do* rely

on arguable allegations of loss causation stemming from the curative statements

issued in July and August of 2001—are not typical of those individuals who

sold all of their shares of SA stock prior to July 2001.  As such, the Court

declines to include within the class definition SA stockholders who sold their shares prior to July 19.[9]  The Court finds, however, that the atypicality of the class representatives' claims to the claims of this small subset of pre-July 19 sellers does not render the claims of the class representatives atypical of the remainder of the class members, and concludes that Plaintiffs' have met the burden of demonstrating typicality as to the remainder of the class members' claims.

In sum, the claims of the proposed class representatives are typical of those of other members of the proposed class, except for pre-July 19, 2001 sellers of SA stock.  Therefore, Rule 23(a)(3) is satisfied, but the Court excludes pre-July 19, 2001 sellers from the class definition.

c.   <u>Vigilant Investors</u>

Defendants assert that Vigilant is subject to unique reliance defenses, and thus, its claims are not typical of those of the class members.  In this respect, Defendants argue that: (1) Vigilant has not established that the market for SA put options was efficient, and (2) Vigilant cannot successfully invoke the presumption of reliance because its controlling officer, Mr. Blumberg, is an

---

[9] As noted below, the Court treats put option sellers in similar fashion, by excluding those put options sellers who wrote options during the class period that were exercised prior to July 19, 2001.

expert in the field of securities and related litigation.  In the Court's view,

neither contention defeats the typicality of Vigilant's claims to those of the

class members.

Notably, Defendants cite no authority for the proposition that Plaintiffs

are obligated to introduce specific evidence of efficiency in the market for SA

put options,[10] over and above Plaintiffs' obligation to adduce evidence of

efficiency in the market for the underlying SA securities.[11]  Rather, it appears

that Defendants misapprehend the nature of the proof of market efficiency

required for Vigilant to avail itself of a presumption of reliance under the fraud

on the market theory.  The relevant question is not whether Vigilant has

established that the market for SA put options was itself efficient.  Rather, the

question is whether a seller of put options is entitled to rely on the stock market

---

[10] A put option is a financial contract in which the buyer pays the seller an agreed-to sum (the premium) in exchange for the right to sell a specified quantity of stock or other asset for a certain price (the strike price) to the option seller during the life of the option.  If the buyer exercises the option, the seller is under a contractual obligation to purchase the underlying stock at the strike price.  Thus, a put option seller generally predicts that the value of the underlying stock will remain above the strike price (or increase) during the life of the option.  If correct, the seller profits the full premium because the buyer never exercises the option.

[11] As is explained in more detail below, Plaintiffs have introduced sufficient evidence of market efficiency in SA securities.

to accurately reflect the value of the underlying stock upon which the put option is sold.

Although there is little authority on the subject, in the Court's view, a put options seller, upon proof of market efficiency in the underlying stock, is generally entitled to a rebuttable presumption of reliance.  See In re Priceline.com, Inc., 236 F.R.D. 89, 100 (D. Conn. 2006) (finding put options trader presumptively relied on integrity of market price in underlying stock and thus was adequate and typical class representative); cf. Tolan v. Computervision Corp., 696 F. Supp. 771, 779 (D. Mass. 1988) ("Traders in puts and calls rely on the integrity of the information disseminated in the market just as do purchasers and sellers of the underlying security."); In re Oxford Health Plans, Inc. Securities Litig., 199 F.R.D. 119, 123-24 (S.D.N.Y. 2001) (holding that options traders were typical and adequate class representatives in action proceeding under fraud on the market theory); Moskowitz v. Lopp, 128 F.R.D. 624, 631 (E.D. Pa. 1989) (holding that options trader could rely upon the fraud on the market presumption and was an adequate class representative).

A put options seller, like the purchaser of stock, generally profits only when a stock maintains or increases its value.  That is so because the option buyer has no reason to exercise the option unless the stock price declines.  If the

21

stock price maintains or increases, and the option expires without the buyer electing to exercise, then the seller profits the premium paid for the option.

Stated another way, by betting that the stock price will maintain or increase, the put option seller generally relies—in like fashion to a stock purchaser—on the integrity of the price of the underlying stock.  He does so both in deciding to sell the option and in setting the premium and strike prices. The put option seller also suffers a harm similar to that suffered by a stock investor when the revelation of the truth concerning prior fraudulent conduct causes an artificially inflated stock price to fall.  In such a case, the put option seller is forced to bear the brunt of the injury caused by the fraud.  Once the option buyer predictably exercises the option, the seller is effectively forced to purchase the stock at the fraudulently inflated strike price—retroactively placing the put options seller in the shoes of a defrauded stock purchaser.

In sum, therefore, where a put options seller demonstrates market efficiency in the underlying security, he is generally entitled to rely on the fraud on the market theory.  As the Court discusses in greater detail below, Plaintiffs have adduced sufficient evidence demonstrating that the market for SA stock during the class period was efficient.  Because Defendants offer nothing which could suffice to rebut the presumption of Vigilant's reliance under the fraud on

the market theory, the Court declines to find that Vigilant is atypical due to the lack of evidence of efficiency in the market for SA put options.[12]

In their second challenge, Defendants argue that Vigilant cannot invoke the presumption of reliance because "Mr. Blumberg is an expert in the field of securities law and related litigation."  However, a plaintiff's expertise and sophistication is not relevant to the typicality inquiry.  See Kennedy v. Tallant, 710 F.2d 711, 717 (11th Cir. 1983) (holding that sophistication of class representative is irrelevant to the issue of typicality); Blackie v. Barrack, 524 F.2d 891, 905 (9th Cir. 1975) ("Differences in sophistication among purchasers have no bearing in the impersonal market fraud context, because dissemination of false information necessarily translates through market mechanisms into price inflation which harms each investor identically."); In re Amerifirst Securities Litig., 139 F.R.D. 423, 429 (S.D. Fla. 1991) ("[T]he law in this

---

[12] Nevertheless, the Court narrows the class definition of put options sellers in similar fashion as it did with regard to the purchaser/sellers of SA stock.  The claims of proposed class representative Vigilant, which sold put options during the class period that were not exercised until July 19 or afterwards, are not typical of put options sellers whose options were exercised prior to July 19, 2001.  As to the latter, the Complaint offers no arguable legal basis for proving the element of loss causation as to their claims.  Thus, the Court defines the class as inclusive of only those put options sellers who wrote put options during the class period which were exercised on or after July 19, 2001.

Circuit is that neither a representative's degree of investment experience and sophistication nor his degree of reliance will preclude satisfaction of the typicality requirement on a motion for class certification."); <u>Michaels v. Ambassador Group, Inc.</u>, 110 F.R.D. 84, 89 (E.D.N.Y. 1986) ("If the defendants perpetrated a fraud-on-the-market, then even the most sophisticated investor would be deceived.").  Vigilant's participation in prior securities litigation does not alone render its claims atypical of those of the class members.

In sum, Defendants' challenges to the typicality of Vigilant's claims as to those of other class members are without merit.  Because Vigilant's claims arise from a similar course of conduct and share the same legal theory as those of the class members, Vigilant satisfies the typicality requirement of Rule 23(a)(3).

### C.    Adequacy of Representation

The adequacy of representation prerequisite of Rule 23 requires that the class representatives have common interests with the non-representative class members and requires that the representatives demonstrate that they will vigorously prosecute the interests of the class through qualified counsel.[13]

---

[13] In this case, Defendants do not contest the adequacy of Plaintiffs' counsel, and the Court finds that class counsel will adequately represent the interests of the class.

24

<u>Piazza</u>, 273 F.3d at 1346.  Thus, the adequacy of representation analysis involves two inquiries: "(1) whether any substantial conflicts of interest exist between the representatives and the class, and (2) whether the representatives will adequately prosecute the action."  <u>Valley Drug Co. v. Geneva Pharms., Inc.</u>, 350 F.3d 1181, 1189 (11th Cir. 2003) (quoting <u>In re HealthSouth Corp. Securities Litig.</u>, 213 F.R.D. 447, 460-461 (N.D. Ala. 2003)).  The existence of minor conflicts alone are not sufficient to defeat a party's claim to class certification.  Rather, "the conflict must be a 'fundamental' one going to the specific issues in controversy."  <u>Id.</u>

In opposing class certification, Defendants contend that (1) class certification should be denied because class representatives all purchased SA stock before the July 19, 2001 disclosure and thus cannot adequately represent the interests of post-July 19th purchasers; (2) Vigilant Investors cannot adequately represent class members because it is subject to unique defenses; and (3) seller/purchaser conflicts exist among class members which render the interests of class members antagonistic to one another.  The Court addresses each of Defendants' arguments in turn.

      1.    <u>Adequacy of pre-July 19 purchasers' representation of post-July 19 purchasers</u>

Defendants argue that Plaintiffs Graeber, Hale, and Petersen cannot adequately represent class members who purchased SA shares after the July 19, 2001 disclosure.  This is so, Defendants posit, because individuals who purchased SA stock prior to the July 19, 2001 disclosure do not have to prove that the July 19, 2001 disclosure was itself fraudulent, or that other actionable misstatements were made between July 19 and August 16, 2001.  Defendants assert that investors who purchased SA stock after the July 19, 2001 disclosure would be required to prove that the price of SA shares was artificially inflated during that period due to the July 19, 2001 disclosure and despite what curative effect the July 19, 2001 disclosure may have had.  Defendants also argue that, because "the post-July 19, 2001 investors are subject to numerous unique defenses that do not apply to pre-July 19, 2001 purchasers like Graeber, Hale, and Petersen," these individuals cannot adequately represent the interests of post-July 19, 2001 purchasers.  (Resp. at 17.)

For largely the same reasons provided above in the Court's discussion of typicality, the Court concludes that Defendants' argument relies on a flawed understanding of the claims of post-July 19th purchasers, and as such, is

without merit.  Plaintiff's class allegations rely on identical allegations of fraud that occurred during the Class Period and which allegedly inflated the price of SA stock both before and after the July 19th curative disclosure.  While Plaintiffs assert in their class certification papers that the July 19th disclosure was itself materially misleading because it only partially revealed the extent of Defendants' prior fraud—it does not follow that post-July 19th purchasers must necessarily prove independently actionable statements occurring on July 19 to succeed on their fraud claims.  In any event, nothing about the positions of the class representatives indicates the existence of a conflict of interest which goes to the heart of the case, and Defendants have not demonstrated that their interests are antagonistic to those of class members who purchased shares after the July 19, 2001 disclosure.  To the contrary, their interests are aligned: "It will be in the interest of each class member to maximize the inflation from those causes at every point in the class period, both to demonstrate the *sine qua non* liability and to maximize his own potential damages[;] the more the stock is inflated, the more every class member stands to recover."  Blackie v. Barrack, 524 F.2d 891, 909-10 (9th Cir. 1975); see also CV Reit, Inc. v. Levy, 144 F.R.D. 690, 698 (S.D. Fla. 1992) (rejecting argument that the plaintiffs are not adequate class representatives because they have little incentive to prove the

materiality of nondisclosures made subsequent to their own stock purchases in order to recover their own claims); In re Baldwin-United Corp. Litigation, 122 F.R.D. at 424, 428 ("[U]npersuasive is the argument . . . that the Plaintiffs who purchased . . . early in the class period have no incentive to prove facts relevant to a purported fraud committed on a subsequent purchaser.").

Accordingly, the proposed class representatives adequately represent post-July 19 purchasers notwithstanding the fact that they purchased their shares before that date.

### 2.   Vigilant Investors

Defendants assert that Vigilant is not an adequate representative of the proposed class because Vigilant "shorted" SA stock and failed to accurately disclose its SA stock transactions on its shareholder certification.  With respect to their first point, Defendants argue that it is not appropriate to appoint as a representative plaintiff an investor who engaged in "short selling" because that investor, unlike other members of the class, effectively bet against the market price of the security rising.[14]

---

[14] "A short seller, who borrows shares to sell, also turns a profit when the price of the shares he sold decreases.  The short seller can replace the shares he borrowed from the lender by purchasing them at a reduced price and retain the difference between the short sale price paid to him and the price paid to replace the shares." In re Priceline, 236 F.R.D. at 100 n.2.

In certain instances, short selling may be inconsistent with the assumptions of the fraud on the market theory.  See In re Critical Path, Inc. Securities Litig., 156 F. Supp. 2d 1102, 1109-10 (N.D. Cal. 2001); Zlotnick v. TIE Communications, 836 F.2d 818, 821-23 (concluding that short seller may not rely on rebuttable presumption of reliance under fraud on the market theory because short seller operates under assumption that market price does not accurately reflect a stock's true value).  While there is at least a question in this case as to whether Vigilant engaged in such trading practices on a limited basis, the Court declines to find, on the facts of this case, that it is an inadequate representative for that reason.  The record reveals that Vigilant wrote a put option on July 13, 2001, for 20,000 shares of SA stock.  When Defendants issued their July 19, 2001 curative disclosure and the stock price fell approximately 35%, Vigilant suffered a loss of approximately $150,000. (Def.'s Resp. [234], Ex. 6.)  In light of that transaction, Vigilant has every incentive to vigorously prosecute its claims in this case, and as such, its interests are entirely aligned with those of the other class members.  Therefore, Vigilant's trading practices do not render it an inadequate class representative.

With respect to Defendants' second argument, the Court similarly declines to find Vigilant to be an inadequate representative due to its failure to

disclose all put options transactions concerning SA stock on its shareholder certification.  While Defendants are not entirely clear on this point, the Court understands Defendants' argument to be that this failure calls into question Vigilant's credibility, and that this alleged lack of credibility has the potential to distract the litigation and harm the class members whom Vigilant represents.

"A plaintiff's lack of credibility and the impurity of his motives can render him an 'inadequate' class representative."  Dubin v. Miller, 132 F.R.D. 269, 272 (D. Colo. 1990).  But, "[t]o defeat class representation, any allegations concerning the representative's adequacy must be relevant to the claims in the litigation, such that the problems could become the focus of cross-examination and unique defenses at trial, to the detriment of the class." German by German v. Federal Home Loan Mortg. Corp., 168 F.R.D. 145, 154 (S.D.N.Y. 1996) (quotations omitted).  Thus, to render a class representative inadequate, an attack on his credibility must be "on an issue critical to one of [his] . . . causes of action."  Kline v. Wolf, 702 F.2d 400, 403 (2d Cir. 1983).

Here, Defendants complain that Vigilant failed to disclose all of its transactions relating to SA stock on its PSLRA certification.  In the Court's view, this failure is not sufficient to render Vigilant an inadequate representative.  Defendants do not argue that questions concerning Vigilant's

30

compliance with the disclosure requirements of the PSLRA implicate a critical issue in this litigation.  In view of this failing, and because Vigilant's disclosure was subsequently completed by amendment, the Court declines to find that Vigilant's initially incomplete PSLRA certification precludes it from adequately representing the interests of class members in this case.

### 3.    Purchaser/Seller conflicts

Defendants assert that a conflict exists between class members who bought SA stock during the class period and those class members who bought but thereafter sold SA stock during the class period.  Defendants observe that class members who purchased on any given day have an incentive to show that the price they paid was maximally inflated due to the alleged fraud (to later recoup the maximum damages when the price declines), while class members who sold on the same day have an incentive to show that the price at which they sold was, at the time of sale, minimally inflated by the alleged fraud (in an effort to show that their loss was entirely caused by an earlier revelation of fraud).  Defendants contend that this conflict renders the class representatives inadequate, and thus, precludes class certification.[15]

---

[15] As the Court has previously held, individuals who acquired SA stock during the class period but sold their shares prior to July 19, 2001, are excluded from the class. Defendants' argument must thus be considered as pertaining only to the asserted conflict

In support of their position, Defendants rely on the case of <u>In re Seagate Technologies II Securities Litigation</u>, 843 F. Supp. 1341, 1358 (N.D. Cal. 1994).  In <u>Seagate</u>, the court criticized the presumption of reliance in securities fraud cases, contending that it leads courts to ignore the traditional elements of a securities fraud claim.  <u>See Seagate</u>, 843 F. Supp. at 1357-58 ("Acceptance of the logic of the fraud on the market theory . . . leads to the conclusion that there is no need in a securities fraud case for separate inquiries into materiality, reliance, causation, and damages." (quoting Daniel R. Fischel, Use of Modern Finance Theory in Securities Fraud Cases, 38 Bus. Law 1, 13 (1982))).  It also found irreconcilable the interests of individuals who purchased and individuals who sold stock on the same day because of the incentive to maximize one's own damages by maximizing price inflation on the date of purchase and maximizing loss on the date of sale.  Because the <u>Seagate</u> Court concluded that buyers and sellers had antagonistic interests with respect to the "central" issue of price inflation, the court concluded that a conflict over price inflation necessarily "is at the 'heart of the suit,' " and thus could preclude a finding of adequacy of representation.  <u>See id.</u> at 1358.

_____

between individuals who purchased stock during the class period and sold stock on the July 19, 2001, and afterwards.

A decided majority of courts have declined to follow Seagate, however, including one court in this district.  See, e.g., In re Miller Indus., Inc. Sec. Litig., 186 F.R.D. 680, 687 (N.D. Ga. 1999) ("Given the strong weight of authority against the reasoning of Seagate Technology II and the Eleventh Circuit's inclination to certify classes in securities-fraud cases, the Court rejects the Defendants' contentions that the alleged intra-class conflicts should preclude class certification.").  These courts have reasoned that the amount of price inflation chiefly relates to the amount of an individual class member's damages, an issue which does not in and of itself defeat class certification.  In In re Gaming Lottery Securities Litigation, 58 F. Supp. 2d 62 (S.D.N.Y. 1999),  for example, the Court rejected the reasoning of Seagate Technology II, explaining:

> [Seagate] overstates the importance of price inflation.
> The chief role of price inflation remains its function in
> determining each plaintiff's damages.  The common
> questions with respect to whether misleading
> statements or omissions were made, whether such
> statements were material, and whether they were
> made with scienter, bind class members with more
> force than the varying questions related to price
> inflation drive them apart.

Id. at 70.

A myriad of other courts have expressed similar doubt concerning the reasoning of Seagate Technology II.  See In re Baan Co. Securities Litig., 2002

33

WL 32307825, *7 (D.D.C. Jul. 19, 2002) (rejecting <u>Seagate Technology II</u> and

stating that "any minor conflicts in the timing of the purchase and sale of stock

by class members are far outweighed by the common interest in establishing

misrepresentations made by defendants, and do not stand as a bar to

certification"); <u>In re Oxford Health Plans, Inc. Securities Litig.</u>, 191 F.R.D. 369,

377 (S.D.N.Y. 2000) (stating that "the holding in <u>Seagate</u> has been widely

discredited"); <u>Weikel v. Tower Semiconductor Ltd.</u>, 183 F.R.D. 377 (D.N.J.

1998) (stating that "[g]iven the weight of authority, and the favor with which

this Circuit views Federal securities law class actions, the reasoning of <u>Seagate</u>

<u>II</u> will not be followed," and explaining that "[a]ny concerns that may arise can

be adequately addressed by the creation of subclasses"); <u>In re Mut. Sav. Bank</u>

<u>Sec. Litig.</u>, 166 F.R.D. 377, 384 (E.D. Mich. 1996) (disagreeing with <u>Seagate</u>

and finding that creation of subclasses is a manageable way to minimize any

potential conflict); <u>Freedman v. Louisiana-Pacific Corp.</u>, 922 F. Supp. 377 (D.

Or. 1996) (declining to follow <u>Seagate</u> and stating that "the conflict, if any, is

peripheral, and substantially outweighed by the class members' common

interests . . . in establishing the existence and materiality of

misrepresentations"); <u>In re Intelligent Electronics, Inc., Securities Litigation</u>,

1996 WL 67622, *4 (E.D. Pa. 1996) (denial of class certification based on

purely theoretical conflicts is not warranted); <u>Picard Chem. Profit Sharing Plan v. Perrigo Co.</u>, 1996 WL 739170 (W.D. Mich. 1996) (holding that the potential for intra-class conflict is a peripheral concern to a class whose primary interest is in proving the materiality of the alleged omissions in an effort to prove liability); <u>In re Regal Communications Corp. Sec. Litig.</u>, 1995 WL 550454, at *8 (E.D. Pa. 1995) (stating that, "contrary to <u>Seagate II</u>, it is the existence and materiality of a misstatement or omission that is central, and from it, price inflation and reliance are presumed"); <u>Welling v. Alexy</u>, 155 F.R.D. 654, 662 (N.D. Cal. 1994) ("We altogether disagree . . . that such potential conflicts afford a valid reason at this time for refusing to certify a class."); <u>In re AST Research Sec. Litig.</u>, 1994 WL 722888, at *4 (C.D. Cal. Nov. 8, 1994) ("Any conflicting interests in trading fluctuations in inflation during the class period are secondary."); <u>Yamner v. Boich</u>, 1994 WL 514035, at *8 (N.D. Cal. Sep. 15, 1994) (disagreeing with the view expressed in <u>Seagate II</u> that conflicts over price inflation are essentially conflicts over liability issues such as materiality). <u>But see</u> <u>Ziemack v. Centel Corp.</u>, 163 F.R.D. 530 (N.D. Ill. 1995) (adopting <u>Seagate</u>); <u>Ballan v. Upjohn Co.</u>, 159 F.R.D. 473 (W.D. Mich. 1994) (same).

In view of this weight of authority, the Court declines to follow <u>Seagate</u> in this case, and agrees with the majority view that any buyer-seller conflicts

which may arise in this case can be adequately dealt with through the creation of subclasses.  Unlike in <u>Seagate</u> and <u>Ballan</u>, one of the few cases which found <u>Seagate</u>'s reasoning persuasive, the alleged partial disclosures in this case were neither numerous nor made over an extended period of time.  <u>Contrast</u> <u>Ballan</u>, 159 F.R.D. at 484 (finding creation of subclasses inappropriate where plaintiffs alleged nine misrepresentations, fifteen omissions, and nineteen curative disclosures on thirty-one different occasions).  Where, as here, there are at most two alleged curative disclosures, the creation of discrete subclasses remains a viable and easily manageable option.  <u>See, e.g.</u>, <u>In re Intelligent Electronics</u>, 1996 WL 67622 at *5 (finding use of subclasses adequate); <u>In re Mutual Sav.</u> <u>Bank</u>, 166 F.R.D. at 385 (same); <u>Picard Chem.</u>, 1996 WL 739170, at *6 (same).  Accordingly, the Court declines to find that the theoretical possibility of seller-purchaser conflicts is sufficient to preclude class certification under Rule 23(a)(4).

In sum, the Court finds that no substantial conflicts of interest exist between the class representatives and the class members.  The Court also finds that the representatives will adequately prosecute this action.  Accordingly, the Court concludes that Plaintiffs' class meets the adequacy of representation requirements of Rule 23(a)(4).

## II.      Rule 23(b)

### A.      Predominance of Common Issues

Once the plaintiffs have established the four prerequisites of Rule 23(a),

they must also satisfy at least one of the alternative requirements of Rule 23(b).

Piazza, 273 F.3d at 1346.  In this case, Plaintiffs assert that they have satisfied

Rule 23(b)(3), which provides that class treatment may be appropriate where

"the court finds that the questions of law or fact common to the members of the

class predominate over any questions affecting only individual members and

that a class action is superior to other available methods for the fair and efficient

adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  Matters that the

Court may consider in making this determination include:

> (A) the interest of members of the class in
> individually controlling the prosecution or defense of
> separate actions; (B) the extent and nature of any
> litigation concerning the controversy already
> commenced by or against members of the class; (C)
> the desirability or undesirability of concentrating the
> litigation of the claims in the particular forum; (D) the
> difficulties likely to be encountered in the
> management of a class action.

Id.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes

are sufficiently cohesive to warrant adjudication by representation." Amchem

Prods. Inc. v. Windsor, 521 U.S. 591, 623, 117 S. Ct. 2231, 138 L. Ed. 2d 689

(1997).  "That common questions of law or fact predominate over

individualized questions means that 'the issues in the class action that are

subject to generalized proof, and thus applicable to the class as a whole, must

predominate over those issues that are subject only to individualized proof.' "

Rutstein, 211 F.3d at 1233 (quoting Kerr v. City of West Palm Beach, 875 F.2d

1546, 1558 (11th Cir. 1989)).  "The predominance requirement 'does not

require that all issues be common to all parties,' rather, it mandates that

'resolution of the common questions affect all or a substantial number of the

class members.' " In re Tri-State Crematory Litig., 215 F.R.D. 660, 692 (N.D.

Ga. 2003) (quoting Watson v. Shell Oil Co., 979 F.2d 1014, 1022 (5th Cir.

1992)).  Common questions of fact or law will therefore predominate if they

have a direct impact on every class member's effort to establish liability and on

every class member's entitlement to relief.  Klay v. Humana, Inc., 382 F.3d

1241, 1255 (11th Cir. 2004).  In contrast, "[w]here, after adjudication of the

classwide issues, plaintiffs must still introduce a great deal of individualized

proof or argue a number of individualized legal points to establish most or all of

the elements of their individual claims, such claims are not suitable for class

certification under Rule 23(b)(3)."  Id.

38

Defendants contend that class certification is inappropriate under Rule 23(b)(3) because individual issues will predominate over common ones.  In this respect, Defendants argue, first, that individual issues of reliance will predominate over common issues because Plaintiffs will not be able to avail themselves of a presumption of reliance under the "fraud on the market" theory. Second, Defendants argue that individual issues of damages will predominate because Plaintiffs have not demonstrated that damages can be calculated on a class-wide basis.  The Court addresses each of Defendants' arguments in turn.

      1.    <u>Reliance</u>

"To determine whether common questions predominate, [the Court is] called upon to examine the cause of action asserted in the complaint on behalf of the putative class."  <u>Allapattah Svcs., Inc.  v.  Exxon Corp.</u>, 333 F.3d 1248, 1260 (11th Cir. 2003) (quoting <u>Rutstein</u>, 211 F.3d at 1234 (alterations omitted)).  Thus, to determine whether the predominance requirement of Rule 23(b)(3) is satisfied in this case, the Court considers what Plaintiffs must prove to prevail on their claims under § 10(b) of the Exchange Act and Rule 10-b5, and whether the elements of each of these claims are susceptible to class-wide proof.

In order to establish a violation of § 10(b) of the Exchange Act and Rule 10-b5, Plaintiffs must prove (1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which plaintiffs relied, (5) that proximately caused their injuries.  Ziemba v. Cascade Intern., Inc., 256 F.3d 1194, 1202 (11th Cir. 2001).  With respect to the reliance element, plaintiffs who are proceeding under a traditional fraud theory must usually prove actual, individualized reliance on the material misstatement or omission, thereby precluding resolution of their claims through a class action.  See, e.g., Castano v. Am. Tobacco Co., 84 F.3d 734, 745 (5th Cir. 1996) ("[A] fraud class action cannot be certified when individual reliance will be at issue.").  The Supreme Court has recognized, however, that "modern securities markets, literally involving millions of shares changing hands daily, differ from the face-to-face transactions contemplated by early fraud cases. . . ."  Basic, Inc. v. Levinson, 485 U.S. 224, 240-47, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988).  National securities markets, the Court observed, are "impersonal and well-developed" and thus generally incorporate all publicly available information, including material misstatements.  Id. at 246-47.  On this premise, the Court adopted the widely recognized "fraud on the market" theory, which relieves the plaintiff of the burden of proving actual, individualized reliance on a defendant's

misstatement by permitting a rebuttable presumption that the plaintiff relied on

the "integrity of the market price," which incorporated the misstatement.  Id. at

247.  Thus,

> [t]he fraud on the market theory is based on the
> hypothesis that, in an open and developed securities
> market, the price of a company's stock is determined
> by the available material information regarding the
> company and its business. . . .   Misleading statements
> will therefore defraud purchasers of stock even if the
> purchasers do not directly rely on the statements.

Basic, 485 U.S. at 241-42 (quoting Peil v. Speiser, 806 F.2d 1154, 1160-61 (3d

Cir. 1986)).

       To avail themselves of the fraud-on-the-market theory's presumption, the

plaintiffs must show that (1) the defendant made public material

misrepresentations, (2) the defendant's shares were traded in an efficient

market, and (3) the plaintiffs traded shares between the time the

misrepresentations were made and the time the truth was revealed."  Greenberg

v. Crossroads Systems, Inc., 364 F.3d 657, 661 (5th Cir. 2004).  Defendants

may rebut the presumption by "[a]ny showing that severs the link between the

alleged misrepresentation and either the price received (or paid) by the plaintiff,

or his decision to trade at a fair market price."  Id. at 661-62 (quoting Basic, 485

U.S. at 247).

In opposing class certification, Defendants argue that individual issues of reliance will predominate because Plaintiffs are not entitled to a presumption of reliance under the fraud on the market theory for two reasons:  first, Plaintiffs have failed to adduce sufficient evidence for the Court to find that the market for SA stock was efficient; and second, even if the market for SA stock was efficient, they have adduced sufficient evidence to rebut the presumption of reliance.[16]  The Court disagrees with Defendants on both counts.

a.    <u>The market for SA stock was efficient</u>

Before an investor can be presumed to have relied upon the integrity of the market price for a security, he must demonstrate that the market for that security is was "efficient" during the relevant period.  <u>In re PolyMedica Corp. Securities Litig.</u>, 432 F.3d 1, 7 (3d Cir. 2005).  "Efficiency refers to the flow of information in the relevant market and the effect of that information on the price of the stock."  <u>Id.</u> at 7-8.  "In an efficient market, the defendant's misrepresentations are said to have been absorbed into, and are therefore reflected in, the stock price."  <u>Id.</u> at 8.  On the other hand, where a market lacks

---

[16] In actuality, Defendants' arguments are not nearly so precise.  From their filings, it is not entirely clear whether they rely on Dr. Cox's affidavit to establish that the market for SA stock was not efficient, or whether they rely on that affidavit to rebut a presumption of reliance.  Regardless of how Defendants' challenge is framed, the Court finds it unpersuasive.

AO 72A
(Rev.8/82)

efficiency, "there is no assurance that the market price was affected by the defendant's alleged misstatement at all.  Instead, the price may reflect information wholly unrelated to the misstatement."  Id.

As an initial matter, the parties dispute the extent to which the Court should consider expert testimony on the efficiency issue.  Defendants argue that Plaintiffs are required to come forward with evidence of market efficiency, which is to say, that merely pleading market efficiency is not sufficient to sustain a presumption of reliance.  While the Court agrees with Defendants that it is not enough to merely allege that the market for a given security was efficient, the Court concludes that there is more than sufficient evidence in the record to support a finding of efficiency.

To determine whether a security trades on an efficient market, courts have considered a number of factors, which include:

> (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3 (as opposed to Form S-1 or S-2); (5) the existence of empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price"; (6) the company's market capitalization;

> (7) the bid-ask spread for stock sales; and (8) float, the
> stock's trading volume without counting
> insider-owned stock.

Unger, 401 F.3d at 323; see also Gariety v. Grant Thornton, LLP, 368 F.3d 356,

368 (4th Cir. 2004) (stating that courts "should consider factors such as, among

others, whether the security is actively traded, the volume of trades, and the

extent to which it is followed by market professionals"); Cammer v. Bloom,

711 F. Supp. 1264, 1285-87 (D.N.J. 1989) (examining (1) average trading

volume, (2) number of securities analysts following the stock, (3) number of

market makers, (4) whether the company was entitled to file an S-3 Registration

Statement, if relevant, and (5) evidence of a cause and effect relationship

between unexpected news and stock-price changes).  While proof of every

factor may not be necessary in all cases, "once a court endeavors to apply these

factors, they must be weighed analytically, not merely counted, as each of them

represents a distinct facet of market efficiency."  Unger, 401 F.3d at 323.

        In this case, the record before the Court shows, and indeed Defendants do

not dispute, that at all relevant times SA was listed and actively traded on the

New York Stock Exchange.  (Compl. ¶ 256(a).)  During the class period, more

than 387 million shares of SA stock changed hands.  (Id. ¶ 256(c).)  The daily

trading volume of SA stock averaged greater than 2.6 million shares per day,

44

and the average weekly trading volume, expressed as a percentage of
outstanding shares, ranged between 5.2% and 6% during the class period.  (Id. ¶
256(d).)  SA was followed by at least fourteen different brokerage houses and
or broker/dealers, and in 2001 alone, no less than twenty different analysts
issued reports on the company.  (Id. ¶ 252; Vellrath Decl. ¶ 29.)  At all times
SA was authorized to file S-3 registration statements, and regularly filed
periodic public reports with the SEC.[17]  (Compl. ¶ 256(b); Vellrath Decl. ¶¶ 30-
31.)  In the period leading up to the July 19, 2001 disclosure, the company's
market capitalization was in excess of $5 billion, placing it in the top one-third
of its peers.  (Vellrath Decl. ¶ 33.)  The bid-ask spread for sales of SA stock
never exceeded 1.9%, and the float exceeded 96% during the class period.
Defendants do not challenge the substance of this evidence[18] or its application

---

[17] "Form S-3 is reserved for companies whose stock is actively traded and widely
followed. To file a Form S-3, a company must have filed SEC reports for twelve
consecutive months and possess a seventy-five million dollar market capitalization level."
Unger, 401 F.3d at 323 n.5.

[18] Defendants do complain that much of this evidence was not submitted with
Plaintiffs' Motion for Class Certification, but rather was submitted in reply to
Defendants' opposition to that motion.  While the Court agrees that the better practice
would have been to submit this information at the outset, the Court has given Defendants
ample opportunity to respond to this evidence through the filing of a surreply.  The Court
therefore perceives no prejudice to Defendants resulting from its consideration of this
evidence, and declines to deny Plaintiffs' request to certify a class based upon Plaintiffs'
failure to include this evidence with its original motion.

to the market efficiency factors set forth above.  Accordingly, the Court finds that each of these factors weighs heavily in favor of a finding of market efficiency.

While Defendants do not contest the above factors, neither do they accept Plaintiffs' contentions that the market for SA stock was efficient.  Instead, Defendants take the position that Plaintiffs have failed to establish an efficient market for SA stock because "the price of [SA's] stock did not move in a statistically significant positive way in response to the dissemination of any alleged misstatements identified in the Complaint."  (Br. in Opp'n to Mot. for Class Cert. [234] at 10.)  In support of that position, Defendants rely on the affidavit of their expert, Dr. Cox, who conducted an "event study"[19] which analyzed the effect of 20 allegedly fraudulent statements identified in the Complaint on the market price of SA stock.  (Cox Aff. ¶¶ 10, 14-17.) According to Dr. Cox, the results of his event study did not show statistically significant positive stock price movement in response to these allegedly fraudulent statements.  (Id. ¶ 17.)  Based on these results, he opines that "[t]he

_____

[19] According to Plaintiffs' expert, Dr. Vellrath, an event study "analyzes the responsiveness of a security's price (or, equivalently, a security's return) to announcements that contain new information," and is "the preferred and predominant method for assessing the . . . efficiency of any market."  (Vellrath Decl. ¶ 12(b).)

Complaint's efficiency claim is inconsistent with its allegations of material false and misleading statements." (Id.)

The Court declines to find that the market for SA stock was not efficient based upon Dr. Cox's event study.  First, Dr. Cox's study relates only to one of the nine factors that courts have identified as important in determining market efficiency—namely, the "the existence of empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." Unger, 401 F.3d at 323.  In any event, because a cause and effect relationship is better demonstrated upon the disclosure of *unexpected* information, it is notable that Dr. Cox's event study does not at all consider the alleged curative disclosures of July and August of 2001, which allegedly contained new, market-correcting information that caused, at least in part, an immediate response in stock price.  As is discussed in more detail below, there is substantial evidence demonstrating a causal relationship between the price of SA stock and Defendants' financial releases. Thus, despite Dr. Cox's study, this factor, like each of the others, weighs in favor of efficiency.

Second, Dr. Cox does not opine that the market for SA stock was not efficient.  Instead, his opinion on this issue is limited to his conclusion that the

results of his study "indicate that the Complaint's efficiency claim is inconsistent with its allegations." (Cox Aff. ¶¶ 10, 17.)  In view of his failure to opine on the specific question this Court must address, the Court affords his affidavit little weight.

Third, Plaintiffs have submitted a declaration from their own expert, Dr. Vellrath, in which he affirmatively concludes, based upon an event study which includes an examination of the market response to Defendants' curative disclosures of July and August of 2001, that the market for SA stock was efficient.  The Court, having considered Defendants' objections to the Vellrath affidavit, declines to wholly discount Dr. Vellrath's conclusions.  In the Court's view, (1) Dr. Vellrath's  affirmative conclusion that the market for SA stock during the relevant time period was efficient, (2) his event study's consideration of the alleged truthful revelations at issue in this case, and (3) the other strong indicia of market efficiency noted above, together suffice to demonstrate that the market for SA stock is efficient.

In conclusion, the Court has considered each of the factors identified in Unger, and finds that each strongly indicates that the market for SA stock was efficient.  Therefore, in the absence of sufficient rebuttal evidence, Plaintiffs are entitled to a presumption of efficiency under the fraud on the market theory.

b.     <u>Defendants have not rebutted the presumption of reliance</u>

The presumption of reliance under the fraud on the market theory is rebuttable by "[a]ny showing that severs the link between the alleged misrepresentation . . . and the price received (or paid) by the plaintiff."  <u>Basic</u>, 485 U.S. at 992.  "This would include a showing that 'the market price would not have been affected by' the alleged 'misrepresentations,' as in such a case 'the basis for finding that the fraud had been transmitted through market price would be gone.' "  <u>Nathenson v. Zonagen</u>, 267 F.3d 400, 414 (5th Cir. 2001) (quoting <u>Basic</u>, 485 U.S.  at 992)).

As explained above, Dr. Cox conducted an event study in which he analyzed the effect of each of the of the 20 allegedly fraudulent statements identified in Plaintiffs' Complaint.  He concluded that of those allegedly fraudulent statements, "none had a statistically significant *positive* stock movement."  (Cox Aff. ¶ 17 (emphasis added).)  Defendants contend that the lack of any statistically significant increase in the price of SA stock associated with the allegedly fraudulent statements serves to rebut any presumption of reliance because it "severs the link between the alleged misrepresentations and

49

the price received (or paid) by the plaintiffs."  (Br. in Opp'n to Mot. for Class

Cert. at 10 (quoting <u>Basic</u>, 485 U.S. at 248)).  The Court disagrees.

Contrary to Defendants' argument, the mere absence of a statistically

significant *increase* in the share price in response to fraudulent information

does not "sever the link" between the material misstatements and the price of

the stock.  Rather, price stability may just as likely demonstrate the market

consequence of fraud where the alleged fraudulent statement conveys that the

company has met market expectations, when in fact it has not.  As the Fifth

Circuit has recognized,

> in certain special circumstances, public statements
> falsely stating information which is important to the
> value of a company's stock traded on an efficient
> market may affect the price of the stock even though
> the stock's market price does not soon thereafter
> change.  For example, if the market believes the
> company will earn $1.00 per share and this belief is
> reflected in the share price, then the share price may
> well not change when the company reports that it has
> indeed earned $1.00 a share even though the report is
> false in that the company has actually lost money
> (presumably when that loss is disclosed the share
> price will fall).

<u>Nathenson v. Zonagen Inc.</u>, 267 F.3d 400, 419 (5th Cir. 2001).  Thus, even in

the absence of demonstrated increase in share price resulting from fraudulent

statements, a plaintiff may recover under a fraud on the market theory if that

plaintiff can show that negative truthful information which causes a decrease in share price is related to an allegedly false positive statement made earlier, and that it is more probable than not that it was this negative statement, and not some other factor, that caused a significant amount of the decline.  <u>Greenberg</u>, 364 F.3d at 666.

Here, the substance of Plaintiffs' allegations is that in the period leading up to the class period, SA enjoyed a period of substantial and legitimate earnings growth.  Yet, when negative market conditions caused SA's primary customers to reduce their demand for its products and services, SA issued false or misleading statements which had the effect of shielding those declines in demand from the market.  SA was therefore able to maintain the perception in the market that it was substantially more profitable than it actually was, and in doing so, maintain its share price at an artificially inflated level.  This, of course, came to an end when Defendants revealed the decline in demand for SA products for the first time in their July 19, 2001 curative disclosure, and then further in their August 16, 2001 curative disclosure, with the combined effect of a price tumble of more than 35%.  Plaintiffs' expert, Dr. Vellrath, found the reduction in share price following Defendants' July 19, 2001 and August 16, 2001 disclosures regarding the decline in demand for SA products to be

statistically significant.  (Vellrath Decl. ¶48.)  By contrast, Dr. Cox's event study does not even consider the effects of either the July or August disclosures. (See Cox Aff. Ex. 1-F.)  In view of that failing, which the Court perceives to be a fundamental defect, it declines to conclude that Dr. Cox's affidavit demonstrates that there is no link between the allegedly fraudulent statements and the price of SA stock.

In sum, considering each of the factors identified in Unger, the Court finds that the market for SA stock was efficient.  The Court additionally finds that Defendants have not rebutted the presumption of reliance.  The evidence before the Court supports Plaintiffs' allegations that Defendants' revelations regarding the decline in demand for SA products caused a decrease in the price of SA stock, and that the negative truthful information was related to allegedly false statements regarding increasing demand made earlier.   Accordingly, the Court finds that Plaintiffs are entitled to a presumption of reliance under the fraud on the market theory, and thus, Defendants' contention that individual issues of reliance will predominate is without merit.

### 2.    Individual Damages Issues do not Predominate

Defendants contend that Plaintiffs have failed to satisfy their burden of establishing that a method exists for determining damages on a class-wide basis.

Defendants argue that because Plaintiffs have failed to provide the Court with a workable means for calculating such damages, damages must therefore be calculated on an individual basis, and as such, these individual damages issues will predominate.

On the present record, it is not clear whether damages will be capable of determination by some mathematical formula.  Defendants' expert, Dr. Cox, has opined that the various formulae available for determining damages in a case such as this are unreliable, and fail to yield any reasonable estimate of damages. (See Cox Aff. ¶¶ 28-31.)  Plaintiffs' expert, Dr. Vellrath, offers nothing to rebut Dr. Cox's conclusions, and limits his opinion on this issue to a single statement that he "believe[s] there are tried and tested methods and procedures by which damages of class members can be computed on a formulaic class-wide basis, with relatively little analysis."  (Vellrath Aff. ¶ 42 n.56.)  But, whether or not some formulaic means for calculating damages on a class-wide basis may be employed in this case, the Court is convinced that any individual questions of damages do not preclude class certification.

The mere fact that damages may have to be calculated on an individualized basis does not necessarily establish that individual issues predominate.  See, e.g., Allapattah Services, Inc. v. Exxon Corp., 333 F.3d

53

1248, 1261 (11th Cir. 2003) ("Numerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate."); Klay v. Humana, Inc., 382 F.3d 1241, 1259 (11th Cir. 2004) (same); Sterling v. Velsicol Chemical Corp., 855 F.2d 1188, 1197 (6th Cir. 1988) ("No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action."); see also In re BearingPoint, Inc. Securities Litig., 232 F.R.D. 534, 542 (E.D. Va. 2006) ("Damages are less central to the predominance inquiry; courts generally hold that differences in damages among the potential class members do not generally defeat predominance if liability is common to the class." (quotations omitted)); LaBauve v. Olin Corp., 231 F.R.D. 632, 675 (S.D. Ala. 2005) ("The mere fact of individualized damages computations does not defeat predominance."); In re Tri-State Crematory Litig., 215 F.R.D. at 692 n.20 ("The requirement of determination of damages on an individual basis does not foreclose a finding of predominance or defeat certification of the class."); Upshaw v. Georgia (GA) Catalog Sales, Inc., 206 F.R.D. 694, 701 (M.D. Ga. 2002) ("The existence of some separate issues of law and fact, particularly regarding damages, does not negate class action certification."); Morris v. Wachovia Securities, Inc., 223

54

F.R.D. 284, 299 (E.D. Va. 2004) ("differences in damages among the potential

class members do not generally defeat predominance if liability is common to

the class").  But see Bell Atlantic Corp., 339 F.3d at 307 ("Class treatment . . .

may not be suitable where the calculation of damages is not susceptible to a

mathematical or formulaic calculation, or where the formula by which the

parties propose to calculate individual damages is clearly inadequate.").  The

Eleventh Circuit has emphasized that this is especially true where, as here, there

are few if any individual questions going to the issue of liability.  See Klay, 382

F.3d at 1273 (explaining that "[i]t is primarily when there are significant

individualized questions going to liability that the need for individualized

assessments of damages is enough to preclude 23(b)(3) certification.").

In this case, the Court finds that individual damages issues do not

preclude certification.  First, Plaintiffs will offer common proof on issues of

liability, including that Defendants made public misrepresentations, that those

misrepresentations were material, that the shares were traded on an efficient

market, and that the Plaintiffs purchased those shares after the

misrepresentations were communicated but before the truth was revealed.

Should this case proceed to trial, these overriding and common questions

relating to Defendants' liability will predominate over any issues of damages.

See BearingPoint, 232 F.R.D. at 542 ("Securities fraud cases are particularly

appropriate candidates for treatment under Rule 23(b)(3) since the elements of

the cause of action generally relate to the acts or omissions of the defendants.");

see also Amchem, 521 U.S. at 625 ("Predominance is a test readily met in

certain cases alleging consumer or securities fraud. . . .").

Second, aggregate damages models have been employed in numerous

other federal securities cases.  While Plaintiffs' expert wholly failed to offer any

opinion on the efficacy of such models, and thus the Court declines to find that

the adequacy of such a model will obviate any need to prove individual

damages in this case, the Court intends to conduct further inquiry into the utility

of such models as this case progresses.  Finally, even if the Court ultimately

concludes that aggregate damages models are not sufficiently reliable for use in

this case, the Court is convinced that other viable alternatives exist to address

any individual damages issues that may arise.  See Carnegie v. Household Int'l,

Inc., 376 F.3d 656, 661 (7th Cir. 2004) ("Rule 23 allows district courts to

devise imaginative solutions to problems created by the presence in a class

action litigation of individual damages issues [including] (1) bifurcating

liability and damage trials with the same or different juries; (2) appointing a

magistrate judge or special master to preside over individual damages

56

proceedings; (3) decertifying the class after the liability trial and providing

notice to class members concerning how they may proceed to prove damages;

(4) creating subclasses; or (5) altering or amending the class." (quotations

omitted)); <u>see also</u> <u>In re Broadcom Corp. Securities Litig.</u>, 2005 WL 1403756,

*3 (C.D. Cal. June. 3, 2005) (allowing the fact finder to determine per share

damage per day, and employing a claims administration process to supply the

remaining information to calculate total damages).

In conclusion, the Court finds that common issues predominate.

Plaintiffs are entitled to proceed under the fraud on the market theory, and thus,

individual questions of reliance do not preclude class certification.

Additionally, individual questions of damages do not predominate in this case

given the numerous common issues relating to Defendants' liability under the

securities laws and the various options the Court may employ to address

individual damages claims in the event that no adequate aggregate damage

model is available.  Therefore, the Court finds that Plaintiffs have satisfied the

first prong of Rule 23(b)(3).

**B.    Superiority**

"As a general rule, class action treatment presents a superior method for

the fair and efficient resolution of securities fraud cases." <u>In re HealthSouth</u>

<u>Corp. Securities Litig.</u>, 213 F.R.D. 447, 465 (N.D. Ala. 2003).  "To certify a class under Rule 23(b)(3), the Court must also find that the class action is superior to other available methods of adjudication.  'In making its determination, the Court must find that difficulties in management will not render this action improper for certification.' "  <u>In re Theragenics</u>, 205 F.R.D. at 697 (quoting <u>In re Domestic Air Transp. Antitrust Litig.</u>, 137 F.R.D. 677, 693 (N.D. Ga. 1991)).

Having considered the four factors set forth in Rule 23(b)(3), the Court finds that a class certification is superior to any other method of adjudication. Any interest individual members of the class may have in controlling the litigation is far outweighed by the benefit of distributing the financial burden of the litigation among the class.  Moreover, given the nature of the claims at issue in this case, it would likely be infeasible for class members to prosecute suits against Defendants individually.  This forum is particularly appropriate as it is closest to Defendant SA's corporate headquarters and therefore many of the witnesses.  And finally, the Court does not perceive any difficulties in the management of this litigation that are not otherwise present in any large securities class action.  Accordingly, the Plaintiffs have satisfied the requirements of Rule 23(b)(3).

**III.    Class Definition**

In their final argument, Defendants challenge the class definition Plaintiffs propose on grounds that it is over-inclusive.  Defendants argue that the Class cannot include investors who purchased shares of SA stock after the July 19, 2001 disclosure because that disclosure revealed the truth about SA's business and thus "cured the market."

In seeking class certification, Plaintiffs request that the class period terminate on August 16, 2001.  Defendants urge the Court to shorten the class period, arguing that the July 19, 2001 disclosure "cured the market," and thus, individuals who purchased SA stock after that disclosure suffered no loss attributable to Defendants' allegedly false and misleading statements.  In response to this argument, Plaintiffs take the position that the July 19, 2001 disclosure was, at least in part, itself false and misleading in that it attributed the decline in bookings to "the uncertain economic climate and reduced digital marketing efforts by cable operators during the slower summer vacation." According to Plaintiffs, it was not until the August 16, 2001 disclosure that the full truth was exposed concerning the decline in demand for SA's products and the resulting impact that decline would have on SA's business.  Thus, Plaintiffs

AO 72A
(Rev.8/82)

argue that extending the class period up to and including August 16, 2001 is consistent with the allegations in their Complaint.

Numerous courts have held that, in a securities class action based on material misrepresentations and omissions to the investing public, the class period should end when curative information is publicly announced or otherwise effectively disseminated to the market.  See, e.g., In re Kirschner Medical Corp. Securities Litig., 139 F.R.D. 74, 82 (D. Md. 1991); Simpson v. Specialty Retail Concepts, 149 F.R.D. 94, 103 (M.D.N.C. 1993); Tapken v. Brown, 1992 WL 178984, *32 (S.D. Fla. 1992); Deutschman v. Beneficial Corp., 132 F.R.D. 359, 383 (D. Del. 1990).  "At that point subsequent purchasers are charged with the knowledge of the true state of business affairs, and thus common questions of law or fact arising from the misrepresentations or omissions do not predominate as to those subsequent purchasers, who are therefore excluded from the class."  In re Kirschner Medical, 139 F.R.D. at 82. Where the parties dispute the curative effect of a release, however, these courts agree that the they must determine whether there is a "substantial question of fact as to whether the release had cured the market or was itself misleading." Kirschner, 139 F.R.D. at 82.  If a substantial question exists, then the broader

AO 72A
(Rev.8/82)

time for the class period should be certified.  Id.; see also Simpson, 149 F.R.D. at 103.

On the record before it, the Court concludes that there is a substantial question of fact as to whether the July 19, 2001 disclosure only partially cured the market to justify extending the class period to August 16, 2001.  The precise content of Defendants' July 19, 2001 disclosure is not before the Court. Therefore, while it would appear that the July 19, 2001 disclosure raised substantial questions as to the continued viability Defendants' prior statements and projections, the Court is simply unable, on the present record, to thoroughly evaluate that statement to determine whether it in fact fully addressed each of the alleged misrepresentations so as to cure the market.[20]  Because the Court is unable to determine on the record before it whether the July 19, 2001 disclosure was fully curative, a substantial question exists as to whether that disclosure

_____

[20] The Court notes that the portion of the statement which is in the record strongly indicates that it may not have been fully curative.  By way of example, while the July 19, 2001 disclosure revealed "a flattening of demand," Defendants appear to have attributed this decline, at least in part, to seasonal declines in demand from cable operators.  Yet, as Plaintiffs point out, the seasonal period in question had historically been one of SA's strongest, with the company posting significant sales increases in the same season in multiple prior years.  Moreover, the record reveals that Defendants' inventory substantially decreased during the 4th Quarter of 2001, despite declining sales, indicating that Defendants knew, at the time they revealed in July of 2001 a supposed seasonal "flattening" of demand, that in fact demand was materially declining, and had already adjusted production accordingly.

61

was sufficient to cure the market.  In view of this uncertainty, the Court declines

to terminate the class period on that date, and instead finds that the class period

should extend until August 18, 2001.[21]

## Conclusion

For the reasons stated herein, Plaintiffs' Motion for Class Certification is

hereby **GRANTED**.  The Court hereby appoints as class representatives in this

action Alexander Peterson, Hugh G. Peterson, III, Jack Graeber, Roger Hale,

and Vigilant Investors LP.

The following Class is hereby certified:

> The Class certified by this Order includes all persons
> who purchased or otherwise acquired the securities of
> Scientific-Atlanta, Inc. ("SA") between January 18,
> 2001, and August 16, 2001, inclusive and retained
> said securities on or after July 19, 2001, or who sold
> put options of SA between January 18, 2001, and
> August 16, 2001, inclusive, which options were
> exercised on or after July 19, 2001(the "Class").
> Notwithstanding the foregoing, the following persons
> and entities are excluded from the Class: (i) the
> Defendants to this action; (ii) the officers and
> directors of SA; (iii) any entity in which any
> Defendant or officer or director of SA has or had a
> controlling interest; and (iv) the legal affiliates,
> representatives, heirs, controlling persons, successors

---

[21] Of course, should information come to the Court's attention which calls that conclusion into question, the Court would remain free to modify the class period so as to terminate on an earlier date.

AO 72A
(Rev.8/82)

and predecessors in interest or assigns of any of the
persons or entities identified in (i), (ii) or (iii) above.
The Class is certified to pursue all claims against
Defendants for violation of the federal securities laws,
including violations of §§10(b) and 20(a) of the
Securities Exchange Act of 1934 and SEC Rule 10b-5
promulgated thereunder.  Pursuant to Fed. R. Civ. P.
23(c)(1)(B), the Court reaffirms the appointment of
Chitwood Harley Harnes, LLP and Keller Rohrback
LLP as class counsel.

Pursuant to Rule 23(c)(1), the Court's certification decision is conditional,
and should circumstances warrant, the court may, at a later time, and upon
appropriate motion, reconsider its decision.

**SO ORDERED** this _7th_ day of September, 2007.


_____
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)