**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

IN RE SCIENTIFIC ATLANTA, INC.
SECURITIES LITIGATION,

CIVIL ACTION
NO. 1:01-CV-1950-RWS

**O R D E R**

This case is before the Court on Defendants' Motion for Summary

Judgment [412, 420] and Defendants' Motion to Strike and Motion in Limine

Concerning Inadmissible Evidence of Collateral Government Proceedings [439,

445].  After reviewing the record and considering the arguments of the parties,

the Court enters the following Order.

**Background**

The Court here summarizes Plaintiffs' case as set forth in the

Consolidated Class Action Complaint ("the Complaint") [35], Defendants' Rule

56.1 Statement of Undisputed Material Fact ("SOF") [412-2 and 412-3],[1]

Plaintiffs' Rule 56.1 Statement of Material Facts ("SMF"),[2] and SMF Ex. 3u:

Amended Expert Report of Steven L. Henning, Ph.D., CPA dated November

14, 2008 ("Henning Am. Rep.").  Nothing in this opinion should be construed

as deeming admitted or undisputed the facts asserted in these filings.

The above captioned lawsuit is a putative securities class action.  The

Complaint alleges that Defendants engaged in channel stuffing and improper

accounting practices in an effort to conceal decreasing demand for the products

of Defendant Scientific-Atlanta, Inc. ("S-A").  Plaintiffs further allege that the

persons controlling S-A during the relevant time period disseminated to the

investing public both materially false and misleading information, as well as

---

[1] All exhibits to the SOF were filed in their entirety under seal.  These documents were provided to the Court on a compact disc, and none are available within the Case Management/Electronic Case Filing ("CM/ECF") system.

[2] The following documents were filed in their entirety under seal:
- Plaintiffs' Opposition to Defendants' Motion for Summary Judgment;
- Plaintiffs' Response to Defendants' Rule 56.1 Statement of Undisputed Material Facts;
- Plaintiffs' Rule 56.1 Statement Of Material Facts and accompanying exhibits.

These documents were provided to the Court on a compact disc, and none are available  within the CM/ECF system.  Plaintiffs should file these documents, under seal with the Clerk.

omitted material information, with the result that Plaintiffs and others purchased

S-A securities at an artificially inflated price in violation of Sections 10(b) and

20(a) of the Securities Exchange Act of 1934 ("the Exchange Act"), as

amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA")

and Rule 10b-5 promulgated thereunder.

A.     Defendants' Alleged Wrongful Conduct

Defendant S-A is a cable equipment manufacturer which manufactures

and sells products for the cable television industry, including digital video,

voice, and data communications products. (SOF ¶ 1.)  Defendants James F.

McDonald ("McDonald") and Wallace G. Haislip ("Haislip") served during the

relevant time period as S-A's Chief Executive Officer and Chief Financial

Officer respectively.  (SOF ¶¶ 2-3.)  During the class period, S-A had two

primary business units: the subscriber and transmission business units.  The

subscriber unit manufactured, among other products, digital set-top boxes,

digital head ends, and cable modems.  The transmission unit manufactured

products that allowed cable operators to transmit signals, including video, data,

and voice, to cable subscribers over the cable network.  S-A's main customers

during the class period were cable companies, otherwise known as Multiple System Operators ("MSOs").  (SOF ¶¶ 5, 7-8, 10.)

The Complaint focuses on fiscal year 2001, which began in July 2000 and ended in June 2001.  S-A performed well in the first fiscal quarter of fiscal year 2001, as evidenced by the fact that it experienced record levels of net earnings, subscriber bookings and revenue, and transmission bookings for any first quarter in S-A's history.  (SOF ¶ 109.)  These results also reflected year-over-year and quarter-over-quarter growth in bookings, sales, backlog, and gross margin.  (SOF ¶ 110.)

Plaintiffs allege, however, that this positive news was tempered by S-A's awareness that transmission sales were declining and trending lower each quarter.  Faced with this weakening demand in its transmission business, S-A looked to offset a potential decline in overall sales by increasing sales of subscriber-related products.  (Henning Am. Rep. at 8-9.)

To that end, S-A engaged in a number of aggressive sales practices over its second and third quarters intended to offset (and in some cases, to obscure) this decline in demand.  One such practice involved quarterly efforts to pull in sales from later quarters.  (SMF ¶¶ 10b-e, 18a-b, h.)  To effect these pull-ins,

4

Defendants offered incentives for MSOs to take products earlier than these customers would have otherwise done.  These incentives included discounts coupled with unusually liberal return policies, warehousing credits, and unusually permissive extended payment terms. (SMF ¶¶ 10a-c, e, g, i, 27g.)

As a result of these efforts, S-A's customers accumulated inventories well above the typical baseline for these companies.  While a MSO would typically maintain inventories consisting of four to six weeks worth of deployments, the average inventory for S-A's customers reached 11.7 weeks during the class period.  (SMF ¶¶ 2b, 36e.)  On average, monthly shipments exceeded deployments by twenty-five percent over the course of the class period, with total inventory by S-A's customers exceeding five months of deployments by June 2001.  (Henning Am. Rep. at 10.)  Moreover, S-A was likely aware of these excessive customer inventories, as it was standard practice for S-A's sales staff to monitor inventory levels through constant communication with customers.  (SMF ¶¶ 2b, 3b-c, g, j.)  Plaintiffs allege that such practices amount to actionable channel-stuffing.

In addition to its aggressive sales practices, S-A allegedly boosted its quarterly results by improperly recognizing revenue on several transactions in

violation of policies outlined in the Generally Accepted Accounting Principles ("GAAP").  (SOF ¶ 316; SMF ¶ 31b, e, f; Henning Am. Rep. at 3-2 to 3-5.) )

  B. <u>Defendants' Alleged Misrepresentation</u>

  The class period begins on January 18, 2001.  (Complaint ¶ 72.)  On that date, S-A issued a press release reporting "record financial results" of $707.3 million for the second quarter, a fifty-two increase over the previous year's second quarter.  The press release attributed these results to increases in both subscriber and transmission bookings, as well as the business strategies underlying those results, but omitted information relating to S-A's alleged channel stuffing and accounting practices.  (SMF ¶ 11a.)  In a second press release the same day, S-A stated that it was increasing manufacturing capacity "[i]n response to the continuing acceleration in customer demand."  (SMF ¶ 11b.)  In a conference call following the release of S-A's second quarter earnings, Defendant Haislip forecasted continued growth in S-A's subscriber business, particularly sales of digital set-top boxes, which would offset any decline in transmission revenue.  (SOF ¶ 178.)

  Furthermore, on April 19, 2001, S-A reported third quarter sales of $663.7 million, a fifty-one percent year-over-year increase.  (SMF ¶ 22a.)  In an

6

April 20, 2001 interview, Defendant McDonald described rising consumer demand for S-A's digital set-tops and emphasized analysts' optimism about S-A's future earning potential.  In another interview the same day, McDonald predicted similarly strong sales during the fourth quarter.  (SOF ¶ 119.)  Once again, none of the public statements regarding S-A's sales disclosed its practices of pulling in sales from later quarters or recognizing revenue in violation of GAAP.

For each quarter, Plaintiffs allege that the announcement of the quarter's results was misleading because Defendants did not disclose the pervasive channel stuffing or the prematurely recognized revenue during the third quarter. (Complaint ¶¶ 82, 85, 165.)  Furthermore, Plaintiffs allege that Defendants McDonald and Haislip had access to adverse information about the business, finances, markets, and present and future prospects of S-A during the class period.  As such, Plaintiffs aver that Defendants McDonald and Haislip were obligated to disseminate accurate information about S-A's operations and financial condition and to correct misinformation that could deceive the public. According to the Complaint, Defendants' failure to meet this obligation caused

the price of S-A securities to be inflated artificially, damaging Plaintiffs and the

putative class.

     C.     <u>Correction of the Alleged Fraud</u>

     In a series of disclosures in July and August of 2001, S-A announced that

it had failed to meet revenue forecasts for fiscal year 2001 due to decreased

demand for its products, thereby reducing its earnings forecasts for the first

quarter of fiscal year 2002.  In its press release on July 19, S-A reported that

sales had decreased during its fourth fiscal quarter.  (SMF ¶ 29a.)  S-A

attributed the year-over-year decline in total bookings for that quarter to "the

uncertain economic climate and reduced digital marketing efforts by cable

operators during the slower summer vacation period, in addition to customer

inventory levels and the slower than expected deployment of interactive

applications."  (SMF ¶ 33a.)

     On the same date, in the conference call discussing the press release,

Defendant McDonald told investors that part of the decline in new bookings

resulted from MSOs absorbing inventory that had accumulated earlier in the

fiscal year.  (SMF ¶ 33b.)  S-A's July 19 statements also attributed the

unexpected downturn to a lack of historical data that would have allowed S-A

AO 72A
(Rev.8/82)

to gauge the "sensitivity of demand to changes in the economy," as well as the declining economy's adverse effect upon "consumer purchases of new digital services, and thus purchases of the [S-A's] digital products by the MSOs." (SOF ¶ 252.)

As a result of these announcements, the price of S-A common stock plummeted, dropping from $35.08 per share to $22.80 per share. (SOF ¶ 222.) In the following days, several analysts discussed the various factors that resulted in S-A's disappointing fourth quarter results. Several focused on industry-wide factors as well as the role played by excess customer inventories. (SOF ¶ 253.) Some analysts placed greater emphasis on the inventory correction, while others highlighted the impact of the softening economy and unexpectedly slow deployment of interactive applications associated with digital cable. (SMF ¶ 35 d-i; SOF Ex. 109.)

The class period ends on August 16, 2001, the date of S-A's third disclosure. On that date, S-A filed its Form 10-K for fiscal year 2001 with the SEC, reporting the reduced demand for S-A's products and noting the effect of customers' accumulated inventories. (SOF ¶ 230.) In a press release accompanying the filing, Defendant Haislip stated that S-A anticipated adverse

9

effects on its fiscal 2002 results despite the fact that its customers had recently

reaffirmed or increased their estimates of new digital subscribers to be added

through the end of calendar year 2001.  Once again, S-A attributed this decline

in demand to the declining economy, while also noting the detrimental effect of

an inventory correction.  (SOF ¶ 231.)  Subsequently, the price of S-A stock fell

from $25.01 per share to $21.24 per share.  (SOF ¶ 232.)

Additional facts will be included in the following discussion as necessary

for the legal analysis.

## Discussion

The Complaint alleges that each of the Defendants violated Section

10(b) of the Exchange Act, 15 U.S.C. § 78j(b) (2006), and SEC Rule 10b-5, 17

C.F.R. § 240.10b-5 (2009).  Plaintiffs further allege that the individual

Defendants are "controlling persons" of S-A as defined by Section 20(a) of the

Exchange Act, 15 U.S.C. § 78t(a), and are therefore individually liable for S-

A's alleged violations of Section 10(b) and Rule 10b-5.

Defendants have moved for summary judgment on Plaintiffs' claims

based on Defendants' alleged channel stuffing activities and accounting

violations.  Defendants also seek summary judgment on the ground that the

10

allegedly materially false and misleading statements at issue fall under the safe

harbor of the PSLRA, 15 U.S.C. § 78u-5(c) ("PSLRA Safe Harbor").

Federal Rule of Civil Procedure 56 requires that summary judgment be

granted "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  FED. R. CIV. P. 56(c).  "The moving party bears

'the initial responsibility of informing the . . . court of the basis for its motion,

and identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,

which it believes demonstrate the absence of a genuine issue of material fact.'"

Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004)

(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed.

2d 265 (1986) (internal quotations omitted)).  Where the moving party makes

such a showing, the burden shifts to the non-movant, who must go beyond the

pleadings and present affirmative evidence to show that a genuine issue of

material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257,

106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

11

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

In the case at bar, Defendants contend that summary judgment is proper for the following reasons:  (1) Defendants' allegedly false and misleading statements during the class period are forward-looking statements that fall under the protection of the PSLRA Safe Harbor; (2) with respect to Plaintiffs'

12

claims based on channel stuffing, Plaintiffs have no evidence establishing that

Defendants engaged in any such channel stuffing, that Defendants knew that

such activities would adversely impact future demand for S-A's products, or

that such activities resulted in any loss to Plaintiffs; (3) with respect to

Plaintiffs' claims based on Defendants' accounting violations, Plaintiffs have

no evidence establishing that such violations took place, that such violations

were made with the requisite scienter, or that such violations resulted in any

loss to Plaintiffs; and (4) Plaintiffs' loss causation and damages analysis was

defective due to the Plaintiffs' expert's failure to identify a disclosure correcting

prior alleged misrepresentations, his failure to properly account for the effect of

"confounding news" contemporaneous with the alleged corrective disclosure,

and his improper inclusion of pre-class period conduct in his damages

calculations.  The Court now turns to address the merits of Defendants' motion.


## I.  Violations of Section 10(b) of the Exchange Act and Rule 10b-5

The applicable substantive law identifies which facts are material.

<u>Anderson</u>, 477 U.S. at 248.  A fact is not material if a dispute over that fact will

not affect the outcome of the suit under the governing law.  <u>Id.</u>  An issue is

13

genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Id. at 249-50.  To state a claim for securities fraud under section 10(b) of the Exchange Act[3] and under Rule 10b-5,[4] plaintiffs must allege: (1) a misstatement or omission of material fact, (2) made with scienter, (3) upon which the plaintiff justifiably relied, (4) that proximately caused the plaintiff's damages.  Garfield v. NDC Health Corp., 466 F.3d 1255, 1261 (11th Cir. 2006) (citing Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1281 (11th Cir.1999)).

---

[3] Section 10(b) states, in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

 15 U.S.C. § 78j(b).

[4] Rule 10b-5 makes it unlawful "to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.

14

## II.  Protection of the PSLRA Safe Harbor

As an initial matter, the Court must determine whether the allegedly false and misleading statements at issue fall within the protection of the PSLRA Safe Harbor.  Defendants assert that Plaintiffs' claims rely on forward-looking statements accompanied by meaningful cautionary language, and therefore that the PSLRA shields Defendants from liability for those statements. (Defendants' Memorandum of Law in Support of their Motion for Summary Judgment ("Def.'s Memo.") [412-1] at 7-9.)

The PSLRA Safe Harbor provides protection under certain circumstances against claims brought under the Exchange Act for forward-looking statements. 15 U.S.C. § 78u-5(c)(1).  Forward-looking statements include projections of revenues, management's discussions and analyses of financial conditions, or any statement of the assumptions underlying such projections, discussions, and analyses.  See 15 U.S.C. § 78u-5(i)(1).  Material forward-looking statements are not actionable if they meet either of two criteria: (1) the statement is identified as forward-looking and is accompanied by meaningful cautionary language or (2) the plaintiff fails to prove that the defendant had actual knowledge that the statement was false.  See 15 U.S.C. § 78u-5(c)(1); Edward J. Goodman Life

15

Income Trust v. Jabil Circuit, Inc., 594 F.3d 783, 794-95 (11th Cir. 2010);

Harris v. Ivax, 182 F.3d 799, 803 (11th Cir. 1999).  The satisfaction of either

criterion independently justifies application of the safe harbor.  See Edward J.

Goodman, 594 F.3d at 795 ("[A]ctual knowledge of falsity will not deprive a

defendant of protection by the statutory safe harbor if his forward-looking

statements are accompanied by meaningful cautionary language."); Harris, 182

F.3d at 803 (noting that if forward-looking statement is accompanied by

"meaningful cautionary language," the defendant's state of mind is irrelevant).

    A.    Meaningful Cautionary Language

Plaintiffs contend that Defendants did not include sufficiently meaningful

cautionary language with each statement at issue.[5]  With respect to S-A's

January and April press releases, Plaintiffs assert that the cautionary language

did not accompany the statements at all, and that any cautionary language

present provided insufficient warning of the specific risks known to Defendants.

Resolution of Plaintiffs' first contention requires the Court to determine

the proper statutory construction of the term "accompany" in the safe harbor

---

[5] The question of the alleged falsity of S-A's public statements is intertwined with Defendants' scienter with respect to the underlying channel stuffing and accounting violation claims.  As such, the Court will collectively address all scienter issues below.

16

provision.  For oral statements, the PSLRA does not require that the cautionary

language physically accompany the statement.  Rather, the statute explicitly

allows for a forward-looking statement's incorporation by reference of

cautionary language "contained in a readily available written document, or

portion thereof," such as SEC filings or other "generally disseminated

documents."  See 15 U.S.C. § 78u-5(c)(2)(B);  see also Emp'rs Teamsters Local

Nos. 175 and 505 Pension Trust Fund v. Clorox Co., 353 F.3d 1125, 1133 (9th

Cir. 2004) (safe harbor provision applied where oral statement referred

audience to defendant's 10-K filing).

Both conference calls at issue were accompanied by an oral statement

that additional cautionary statements regarding the subject matter of the

conference calls were contained in  readily available written documents.  In S-

A's January 18, 2001 conference call, it was stated, "Please be advised that a

detailed listing of cautionary statements is available to you in our most recently

filed 10Q."  (SOF ¶ 171.)  A similar warning accompanied the April 19, 2001

conference call.  (Id. at ¶ 191.)  As such, both conference calls sufficiently

incorporated cautionary statements so as to satisfy the "cautionary language"

requirements governing oral statements.

AO 72A
(Rev.8/82)

With respect to written forward-looking statements, while the Eleventh Circuit has not ruled that cautionary language must be contained within the same document as the alleged misrepresentation, this Court has previously endorsed an incorporation-by-reference standard for such written statements. In In re S1 Corp. Securities Litigation, this Court held that the safe harbor protected the defendant company's alleged misrepresentations in a press release discussing the company's upcoming merger, as the press release explicitly referenced SEC forms and subsequent filings which in turn included adequate and detailed cautionary language warning of potential problems with the merger. In re S1 Corp. Sec. Litig., 173 F. Supp. 2d 1334, 1357 (N.D. Ga. 2001). In so holding, Judge Martin cited the Tenth Circuit's Grossman v. Novell, Inc. decision. In that case, the Tenth Circuit held that where plaintiffs rely on a fraud-on-the-market theory of recovery (as in the present case), the court, in determining the adequacy of cautionary language, must examine the total mix of information available to the market at the time of the allegedly fraudulent statements, rather than narrowly focusing on whether the warnings

were contained in the same document.[6]  See Grossman v. Novell, Inc., 120 F.3d

1112, 1122-23 (10th Cir. 1997).  The court, while noting that "[r]emote

cautions are less likely effectively to qualify predictions contained in separate

statements," ultimately held that the cautionary statements contained in the

registration statement could be considered as limiting forward-looking

projections made in press releases discussing an upcoming merger. See id. at

1123.

While these decisions dealt with forward-looking statements regarding

mergers, with the cautionary language at issue contained within SEC filings

associated with the mergers, other jurisdictions have also endorsed, either

_____

[6] In the interest of precision, the Court notes that the Grossman decision involved the judicially-created "bespeaks caution" doctrine, which acts as a defense to claims under the federal securities fraud laws, rather than the PSLRA Safe Harbor.  See Grossman, 120 F.3d at 1119.  The Eleventh Circuit adheres to this doctrine, which states that when "[a defendant's forward-looking statements] are accompanied by meaningful cautionary statements and specific warnings of the risks involved, that language may be sufficient to render the alleged omissions or misrepresentations immaterial as a matter of law." S.E.C. v. Merch. Capital, LLC, 483 F.3d 747, 767 (11th Cir. 2007). While the statutory safe harbor forms a separate defense, courts have frequently interpreted the PSLRA Safe Harbor using "bespeaks caution" decisions and standards as precedent, especially as regards the safe harbor's "cautionary statement" provision.  See, e.g., Harris v. IVAX Corp., 998 F. Supp. 1449, 1454 (S.D. Fla. 1998) (making no distinction between the two defenses in evaluating the sufficiency of cautionary language); In re ValuJet, Inc., 984 F. Supp. 1472, 1478 - 1479 (N.D. Ga. 1997) (using same analysis for both safe harbor and "bespeaks caution doctrine).

explicitly or implicitly, an accompaniment-by-reference standard in other contexts.  See, e.g., Huffy Corp. Sec. Litig., 577 F. Supp. 2d 968, 1014-15 (S.D. Ohio 2008) (extending safe harbor protection to statements contained in a press release, which referenced cautionary language in defendant's 10-K); In re LeapFrog Enters., Inc. Sec. Litig., 527 F. Supp. 2d 1033, 1047 (N.D. Cal. 2007) (finding that cautionary statements, which incorporated by reference defendants' 10-K filed with the SEC, provided sufficient warning for forward-looking statements regarding corporation's earnings, sales, and operations); In re Humphrey Hospitality Trust, Inc. Sec. Litig., 219 F. Supp. 2d 675, 684 (D. Md. 2002) (holding that cautionary statements in SEC filings, such as a 10-K, incorporated by reference are adequate to invoke the PSLRA's safe harbor).

Plaintiffs unpersuasively attempt to distinguish S1 and Grossman, arguing that both decisions should be limited to situations involving a single public offering associated with a specific transaction (i.e., a pending merger). (Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Pl. Opp.") at 65.)  This position amounts to a distinction without a difference, as nothing in Grossman or S1 suggests that the reasoning underlying either decision relies on the nature of the transaction at issue.  Instead, the courts

discussed the degree to which the cautionary language was reasonably related to the allegedly misleading statement, as well as the proximity in time between the cautionary statement and the alleged misrepresentation.  See Grossman, 120 F.3d at 1123; S1, 173 F. Supp. 2d at 1354.

Moreover, at least one court following Grossman has declined to limit its reasoning to situations involving single transactions, such as a merger, rather than a defendant-company's ongoing operations.  See Stavros v. Exelon Corp., 266 F. Supp. 2d 833, 844-45 (N.D. Ill. 2003) (citing both S1 and Grossman in endorsing the incorporation-by-reference standard in securities fraud action predicated on misleading earnings projections).

Therefore, the Court declines to limit S1 on its facts, and holds that under the PSLRA, cautionary statements and risk disclosures need not be included in the same document as the alleged misrepresentations, so long as the risk disclosures were related to and proximate in time to the alleged misrepresentations.  Applying this standard, the Court finds that to the extent that Defendants' statements were forward-looking, such statements were accompanied by sufficiently meaningful cautionary language.  Each of S-A's press releases containing the allegedly misleading statements at issue

incorporated the requisite cautionary language by reference.  Both January 18 press releases, as well as the April 19 press release, advised that "a detailed listing of cautionary statements is available to you in our most recently filed Form 10-Q."  (Id. ¶¶ 172-73, 192.)  The Form10-Q most recent at the time of each press release was the 10-Q for S-A's previous fiscal quarter.  (Id. ¶¶ 174, 195.)

Moreover, each Form 10-Q referenced contained sufficient cautionary language to apprise investors of potential risks similarly significant to those actually realized.  Under the PSLRA, cautionary language must be detailed and informative, setting out what kind of misfortunes could befall the company and what those misfortunes might be, but need not identify which specific factors would result in the realization of that risk.  See Harris v. Ivax, 182 F.3d 799, 807 (11th Cir. 1999).  S-A's Form 10-Q for its first fiscal quarter specifically mentioned the factors which could affect "operations, performance, development and results of our business," such as uncertainties related to economic conditions, uncertainties related to customer plans and commitments, changes in customer order patterns, dependence on cable television spending, and S-A's failure to bring new products to market in a timely manner.  (SOF ¶

22

174.)  This language warned of the exact type of exigencies that would

influence customer demand for S-A's products.

Plaintiffs correctly point out that such language omitted any discussion of

how alleged channel stuffing activities or violations of generally accepted

accounting principles could impact S-A's future results.  However, such

practices were relevant only to the extent that they impacted demand for S-A's

products.  So long as the cautionary statements addressed the type of risk

(declining demand) and effect of that risk's realization (negative impacts to S-

A's future results), such language was sufficiently meaningful for purposes of

the PSLRA Safe Harbor.

Thus, to the extent that the communications at issue in the present case

contained forward-looking statements, the PSLRA Safe Harbor shields

Defendants from liability for those statements.

B.      Application of the PSLRA Safe Harbor to the Alleged Forward-
        Looking Statements

While the Court agrees that any forward-looking statements within the

communications at issue were accompanied by sufficiently meaningful

cautionary language, the question of whether the presence of any such forward-

looking statements entitles Defendants to summary judgment  must still be answered.

In seeking summary judgment pursuant to the PSLRA Safe Harbor, Defendants cite to the following statements:

- An excerpt from S-A's second January 18, 2001 press release, where S-A announced that it was increasing manufacturing capacity and S-A's vice president stated that the company's "primary goal is to make sure we're doing everything we can to meet the growing needs of our customers."

- Defendant Haislip's comments during the January 18 conference call discussing forecasts of S-A's digital set-top shipments and concluding that set-top sales would compensate for slowdown in transmission revenue from AT&T's announced purchasing freeze.

- Portions of several interviews during the month of April where Defendant McDonald predicted continued growth in quarters ahead.

- An excerpt from the April 19 earnings press release highlighting the strengths of S-A's products and the geographic diversity of its

24

markets, where Defendant McDonald also noted that these

characteristics "should enable our growth in the quarters ahead."

(Def.'s Memo. at 9-10; SOF ¶¶ 178-80, 199.)

Having reviewed the parties' briefs in detail, the specific issue on which

Defendants seek summary judgment is not clear. According to their brief,

Defendants seek summary judgment on "[Plaintiffs'] claims *based on* forward-

looking statements." (Def.'s Memo. at 7 (emphasis added).)  Defendants then

enumerate the foregoing statements.  Defendants may be asserting that any of

Plaintiffs' claims associated with the allegedly forward-looking statements cited

above are barred by the PSLRA Safe Harbor.  Alternatively, Defendants may be

seeking a much narrower ruling that these statements, standing alone, do not

independently support a finding of liability.

To the extent that Defendants' motion relies on the PSLRA Safe Harbor,

the first alternative would not warrant the granting of summary judgment

altogether, as the selectively quoted statements above are largely peripheral to

the action before the Court.

With respect to S-A's January statements, Defendants cite to the second

January press release and the January conference call, but ignore that the

gravamen of the Complaint concerns S-A's extensive historical statements from the first January press release. (Complaint ¶¶ 73-75.)  The cited statements from the second press release (discussing S-A's plans to increase manufacturing capacity) and the January conference call (predicting how subscriber sales would offset declines in transmission sales) lose much of their significance when considered in the proper context of the Complaint.  Plaintiffs instead rely heavily on discussions from S-A's *first* press release, which focus on historical results (e.g., sales and bookings from the previous quarter) as well as the business strategies underlying those results. (Complaint at  ¶ 73.)  In contrast, the January statements cited by Defendants constitute a relatively minor portion of the Complaint.  Where Plaintiffs have asserted claims based upon S-A's public statements from January 2001, these claims rely extensively (if not completely) on historical subject matter that Plaintiffs allege to be misleading.

Defendants fare no better in their citation to McDonald's interviews over the month of April 2001.  The focus on the allegedly forward-looking statements from April 9 and April 20 wholly overlooks Plaintiffs' reliance on S-A's numerous statements from April 19, the day S-A released its third quarter results.  The Complaint quotes at length from the historical information

contained within the press release and conference call on that date.  (Complaint ¶¶ 162-63, 167-70.)  These historical statements underlying Plaintiffs' action go completely unaddressed in either of Defendants' briefs on the current motion. As to this theory, the forward-looking character of a wholly separate series of interviews on April 9 and 20 has no bearing on the historical nature of the press release and conference call on April 19.

Finally, Defendants cite to McDonald's arguably forward-looking comment from the April 19 press release, which comprises a single paragraph of the Complaint.  (Complaint ¶ 169.)  However, the Complaint also quotes two wholly separate statements in the April 19 press release, both of which consist of purely historical information regarding the trends underlying S-A's successful quarter and the strong performance of its third-quarter transmission sales in the face of a softening economy.  (Id. ¶¶ 167-68.)

The Eleventh Circuit's guidance suggests that these disparate statements from a single press release should be considered separately, as the court held in Harris that "[t]he PSLRA closes the universe of supposedly false statements under scrutiny to those "specif[ied]" in the complaint.  Harris, 182 F.3d at 804. As such, these two indisputably historical statements from the press release,

which the Complaint quotes in paragraphs 167 and 168, remain unaffected by any forward-looking character in the statement cited by Defendants, which the Complaint quotes in paragraph 169.  Moreover, Plaintiffs' claims also find support from a wholly separate communication, the April 19 conference call. (Complaint ¶ 170.)  Here again, when considering the allegedly forward-looking statement in context, the Court finds that S-A's historical statements constitute the bulk of Defendants' relevant statements from April 19.

The Court concludes that even if it accepted the characterization of the cited statement as forward-looking, Defendants have still failed to avoid liability under the safe harbor provision.  Were the Complaint predicated on these statements alone, the PSLRA Safe Harbor would likely compel the grant of summary judgment.  However, Defendants' excerpts demonstrate little more than an ability to cherry-pick statements not essential to the Plaintiffs' case.  If these putatively forward-looking statements were excised from the Complaint, Plaintiffs could still present voluminous evidence of Defendants' alleged misrepresentations of historical fact during the class period.  For this reason, the PSLRA Safe Harbor does not support a grant of summary judgment as to Plaintiffs' securities fraud claims.

28

The alternative interpretation, where Defendants seek only a ruling that these specific statements could not serve as the sole bases for a securities fraud action, presents a more difficult question.  A determination of the Safe Harbor's application to these particular statements requires the Court to identify the proper level of specificity for the forward-looking analysis, as well as an examination of the statements in the context of both the Complaint and the original communications.  The record, as it now stands, would prove insufficient to allow the Court to resolve that issue.  However, because other rulings contained herein will effectively dispose of the present case, the Court reserves judgment on this question.  Should it become necessary in the future, the Court will request further briefings and schedule oral arguments in order to more fully delineate the precise contours of Defendants' request and determine the forward-looking character of the statements at issue.

Therefore, having considered the arguments of the parties, the Court finds that the PSLRA Safe Harbor does not support a grant of summary judgment at this time.

### III.  S-A's Misrepresentation

Defendants also seek summary judgment on the ground that Plaintiffs cannot prove that the statements in the present case were misleading.  The crux of the Complaint is that during the class period of January 18, 2001 through August 16, 2001, S-A materially misrepresented both its financial position as well as demand for its products.  Plaintiffs contend that this alleged misrepresentation resulted from Defendants' improper recognition of revenue in violation of GAAP as well as Defendants' failure to disclose S-A's pervasive channel-stuffing practices.  In moving for summary judgment, Defendants assert that Plaintiffs can produce no evidence that S-A engaged in any actionable channel stuffing or that any accounting violations took place.

A.    Evidence of Channel Stuffing

Plaintiffs aver that Defendants mislead investors by failing to disclose S-A's alleged channel stuffing activities, which consisted of aggressive sales practices that encouraged larger orders than would be made in the normal course of customers' businesses and inevitably depressed future sales to those customers.

AO 72A
(Rev.8/82)

"Channel stuffing" is a practice where a company floods distribution channels by employing incentives to induce customers into purchasing their products in large quantities, resulting in a short-term bump in revenue while creating excess supply in the distribution chain.  Garfield v. NDC Health Corp., 466 F.3d 1255, 1260 n.1 (11th Cir. 2006); In re Scientific-Atlanta, Inc. Sec. Litig., 239 F. Supp. 2d 1351, 1355 (N.D. Ga. 2002) ("'[C]hannel stuffing' has the effect of shifting earnings into earlier quarters to the detriment of earnings in later quarters.").  Defendants correctly state that there is nothing inherently improper about pressing for sales to be made earlier than in the normal course of business.  See Garfield, 466 F.3d at 1261-62 (quoting Greebel v. FTP Software, Inc., 194 F.3d 185, 202 (1st Cir. 1999)).

However, channel stuffing becomes deceptive when it creates a short-term illusion of increased demand for a company's products, so that a defendant-company's statements about revenue, earnings, financial condition, or future earnings become materially false or misleading or omit a material fact.  In re Coca-Cola Enters. Inc. Sec. Litig., 510 F. Supp. 2d 1187, 1197 (N.D. Ga. 2007); see also In re Harley-Davidson, Inc. Sec. Litig., 660 F. Supp. 2d 969, 985 (E.D. Wis. 2009) ("Channel stuffing becomes deceptive in this context when a

31

defendant's public statements are misleading due to its failure to disclose the practice."). Where such practices risk reducing the company's future revenues by encouraging customers to purchase substantial advance inventories of product, undisclosed channel stuffing may result in an actionable securities fraud claim.  See Carpenters Health & Welfare Fund v. Coca-Cola Co., 321 F. Supp. 2d 1342, 1351 (N.D. Ga. 2004) (finding that plaintiff presented an actionable claim that defendants misrepresented increasing consumer demand by artificially inflating income through channel-stuffing practices).  Moreover, a company is obligated to reveal channel stuffing once sales, earnings, and growth projections are disclosed because such information could be important to a reasonable investor.  See In re Campbell Soup Co. Sec. Litig., 145 F. Supp. 2d 574, 589 (D.N.J. 2001).

This Court has primarily addressed channel stuffing claims at the motion to dismiss stage.  The decision in In re Spectrum Brands, Inc. Securities Litigation provides an analytical framework for evaluating whether plaintiffs have satisfied pleading requirements as to channel-stuffing claims under the PSLRA, including: (1) the incentives employed, (2) the name of the customer or customers, (3) the amount of revenue improperly recognized, (4) the date of at

least one channel-stuffing transaction, (5) plaintiff's basis for asserting that channel inventory was excessive in nature.  See In re Spectrum Brands, Inc. Sec. Litig., 461 F. Supp. 2d 1297, 1308-10 (N.D. Ga. 2006) (finding that plaintiffs failed to satisfy pleading standards when complaint did not allege facts establishing that customers actually purchased product in response to incentives or that customers' resultant inventories were unusually high as a result); see also Coca-Cola, 510 F. Supp. 2d at 1197-98 (discussing complaint's failure to identify customers who accepted excess product and to allege facts indicating that customers received unneeded product).  In the present case, at the summary judgment stage, this analytical framework provides a useful method of evaluating whether Plaintiffs have sufficiently demonstrated a material issue of fact as to each of these elements.

The record contains extensive evidentiary support for the first four criteria identified in the Spectrum decision.  Plaintiffs allege that Defendants offered incentives such as discounts coupled with unusually liberal return policies, warehousing credits, and unusually permissive extended payment terms. Internal documents and correspondence from November and December 2000 demonstrate S-A's emphasis on pulling sales from the third quarter into the

33

second quarter.  (SMF ¶ 10b-e.)  Several emails from January and February 2001

also discuss efforts to pull in sales to the third from the fourth quarter.  (SMF ¶

18a-b, h.)  As established in the deposition testimony of Dr. Allen Ecker, S-A's

executive vice president, S-A often provided incentives "in terms of discounts or

credits" for customers to take product earlier than they otherwise would have

planned.  (SMF Ex. 3l: Ecker Dep. 73:7-15, Feb. 27, 2008.)  This testimonial

and documentary evidence satisfies the <u>Spectrum</u> requirement that the particular

incentives be identified.

Contemporaneous documents provide specific examples of this policy in

action.  At the beginning of the second fiscal quarter, S-A generated a document

outlining its sales strategy for several major customers, including Charter

Communications, Inc. ("Charter"), Adelphia Communications Corporation

("Adelphia"), and Comcast Corporation ("Comcast").  S-A's strategy included

offering cash discounts and extended payment terms in exchange for customers

taking early delivery of products.  (SMF ¶ 10b, c.)  Communications between S-

A and its customers during the third quarter also document the use of shipping

credits and discounts as incentives to pull in sales during the third and fourth

quarters.  (SMF ¶¶ 10e, g, i, 27g.)  In addition, the expert testimony of Dr.

34

Steven Henning demonstrates the use of discounted pricing, third-party warehousing, and favorable return policies throughout the class period. (Henning Am. Rep. at 1-14 to 1-27.)

Dr. Henning's testimony also provides evidence of the channel-stuffing effects of S-A's aggressive sales practices.  Dr. Henning identified 13 transactions where customers agreed to advance shipment of S-A products to dates earlier than the customer's initial request or the product's shipping schedule.  (SMF ¶ 9.)  These transactions include, for example, $11.1 million worth of shipments to Charter and $1.2 million in product to Cable Constructors in December 2000, $24 million worth of orders to Cox Communications in March 2001, and $25 million worth of shipments to Adelphia in March 2001. (Henning Am. Rep. at 1-15 to 1-20.)

Furthermore, Defendants do not dispute that S-A engaged in numerous sales practices with the intent to pull in sales from later quarters. (Def.'s Memo. at 31-32; Defendants' Reply Memorandum in Support of their Motion for Summary Judgment ("Reply Memo.") [412-1] at 14-17.) Defendants acknowledge that such pull-ins took place, noting that these practices occurred on a routine and continuing basis, both before and during the class period.

(Reply Memo. at 16.)  Defendants dispute the characterization of these practices as fraudulent channel stuffing, as opposed to a standard and legitimate sales strategy.

As such, the record contains sufficient evidence to satisfy the <u>Spectrum</u> criteria of identifying the customers involved in channel-stuffing transactions, the amount of revenue recognized from such transactions, and the dates of at least one channel-stuffing transaction.  Plaintiffs argue that S-A's sales practices propped up demand by encouraging customers to purchase earlier than they would in the normal course of business, thereby stuffing customer distribution channels with excess supply. Therefore, the critical dispute between the parties is whether Plaintiffs have put forward sufficient evidence that channel inventory was excessive in nature as a result of S-A's sales practices.

The excess nature of customer inventories depends on the typical baseline for such inventories.  There is evidence supporting Plaintiffs' assertion that a MSO's normal inventory was approximately four to six weeks worth of deployments of S-A's products.  A July 20, 2001 analyst report on S-A's sales used this figure when noting the typical level of customer inventories.  (SMF ¶ 35d.)  Internal S-A documents reflected similar estimates.  (SMF ¶ 6b, d.)  At

36

least one internal S-A presentation from April 2001 listed each customer's required inventory as approximately *one week's* worth of deployments. (Henning Am. Rep. at 11.)

Plaintiffs have presented evidence that S-A's aggressive sales practices drove customer inventories far above this baseline by the third quarter of 2001. By April 2001, S-A was aware that the majority of its customers maintained ten to twenty weeks worth of inventory on hand, far above the four-to-six week baseline. (SMF ¶ 36e.) In addition, expert testimony supports Plaintiffs' contention that shipments continually outpaced customer deployments throughout the class period, resulting in a steady, unbroken rise in excess channel inventory. (Henning Am. Rep. at 10; SMF Ex. 12a: Revised Expert Report of Scott D. Hakala Ph.D., CFA, dated November 14, 2008 ("Hakala Report") at 8.) In particular, Dr. Henning's report shows that on average, monthly shipments exceeded deployments by over twenty-five percent, and that by June 2001, total inventory by S-A's customers exceeded five months of deployments. (Henning Am. Rep. at 10.)

Thus, the record provides ample evidence supporting Plaintiffs' claims of channel stuffing. In response, Defendants argue that Plaintiffs have failed to cite

37

any testimony showing that S-A forced any customer to take more product than it wanted or needed.  Defendants further assert that in the absence of such direct evidence that customer inventories were excessive, the Court must grant summary judgment on the channel stuffing claims.  However, Defendants cite no authority that would compel the Court to wholly discount the extensive circumstantial evidence in the record.

Moreover, Defendants' arguments merely address the weight of Plaintiffs' evidence, a matter more properly reserved for the fact-finder.  See Payne v. Tennessee, 501 U.S. 808, 823, 111 S. Ct. 2597,  115 L. Ed. 2d 720 (1991); Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1363 n.2 (11th Cir. 1999).  As the court is compelled on summary judgment to construe the evidence and any accompanying inferences in favor of the non-movant, the Court finds that Plaintiffs have presented a genuine issue of material fact as to whether S-A's actions constitute actionable channel stuffing.

B.      GAAP Violation Claims

The overstatement of revenues and income in violation of GAAP may constitute false or misleading statements of material fact in violation of Rule 10b-5.  See In re Miller Indus., Inc., 120 F. Supp. 2d 1371, 1379 (N.D. Ga.

38

2000) (evidence that corporation failed to accurately compute earnings in violation of GAAP created genuine issue of material fact as to whether corporation thereby misled investors); S.E.C. v. Caserta, 75 F. Supp. 2d 79, 90 (E.D.N.Y. 1999) ("A statement made in violation of GAAP may be found to be misleading or inaccurate under the federal securities laws.").

Plaintiffs argue that Defendants violated GAAP in transactions with at least two major customers: the improper recognition of revenue on several shipments to AOL Time Warner ("Time Warner") at the end of each fiscal quarter during the class period and the improper recognition of revenue on a single shipment to Rogers Cable in the third fiscal quarter of 2001.[7]

With respect to Time Warner, record evidence indicates that at the end of each fiscal quarter, S-A improperly recognized revenue on shipments to Time Warner from S-A's Juarez, Mexico facility.  As noted in Dr. Henning's report,

---

[7] The parties also dispute the propriety of Defendants' dealings with a third customer, Adelphia.  Defendants have filed a motion to strike evidence [439 & 445] regarding an allegedly fraudulent marketing support arrangement between Adelphia and S-A, contending that such evidence is irrelevant, is unfairly prejudicial, and consists of inadmissible hearsay.  As the inclusion or exclusion of this evidence plays no role in the Court's ultimate decision on the motion under consideration, the court will not, at this time, parse out which portions of this evidence are admissible.  For purposes of summary judgment, the Court will decline to consider Plaintiffs' evidence with respect to Adelphia in examining S-A's alleged accounting violations.  Should the parties proceed to trial, the Court will address issues surrounding the Adelphia-related evidence at that time.

GAAP requires that delivery of the product occur prior to the recognition of revenue on such shipments. (Henning Am. Rep. at 3-2; SAB 101,[8] §A.1.)  For delivery to have occurred, the seller must have substantially completed his obligations under the agreement.  <u>See</u> SAB 101, §A.3.  Recognition of revenue for such shipments is improper unless "only inconsequential or perfunctory actions . . . remain incomplete."  <u>Id.</u>

Plaintiffs have offered evidence that S-A sought to modify its contract with Time Warner in such a way as to allow the recognition of revenue before S-A completed its substantial obligations.  Under S-A's contract with Time Warner, products manufactured in S-A's Juarez facility were required to clear customs and cross the United States border before title and risk of loss transferred to Time Warner.  (Henning Am. Rep. at 3-5.)  Each quarter, Time Warner and S-A signed a written modification to these terms in which the parties agreed that delivery of set-tops occurred, and title would pass to Time Warner when S-A provided the set-tops to Time Warner's carrier at the Juarez facility, rather than when the products crossed the border.  After the transfer of title, S-A would retain responsibility for all duties, documentation, ministerial activities to

---

[8]SEC Staff Accounting Bulletin No. 101 ("SAB 101 ").

clear customs, and freight costs between the Mexico facility and the U.S. border. (Id. at 3-5.)

In his report, Dr. Henning notes that S-A's responsibility to complete the appropriate documentation and ensure that the product shipments cleared customs was critical to the final delivery of these products. Thus, until the products cleared customs, S-A's substantial obligations under its contracts had not been substantially fulfilled.  Absent such completion of delivery, recognition of revenue on these shipments would be improper.  (Id. at 3-4 to 3-5.)

The parties do not dispute the existence, terms, and timing of these quarterly agreements between S-A and Time Warner.  The contested issue is whether S-A satisfied all of its consequential obligations prior to the end of each quarter, as required for S-A to properly recognize revenue from these shipments. Plaintiffs contend that S-A did in fact fail to satisfy these obligations, resulting in revenue overstatements of $1.0 million in the second fiscal quarter, $6.1 million in the third quarter, and $2.3 million in the fourth quarter.  (Henning Am. Rep. at 3-7.)

Considered as a whole, the record evidence supports an inference in favor of these contentions.  S-A signed each modification agreement five days prior to

41

the end of the fiscal quarter.  Dr. Henning concluded in his report that

completion of S-A's duties would require a minimum of four to five days. (SMF

Ex. 3v: Rebuttal Expert Report of Steven L. Henning, Ph.D., CPA dated January

15, 2009 ("Henning Reb. Rep.") at 41-42).  Plaintiffs also provide evidence that

on at least one occasion, a managing employee at the Juarez facility voiced

concern regarding this arrangement. In a December 30, 2000 email to members

of S-A's financial group, Jesus Chairez raised concerns about four trailers of

product for which a sale was recorded on December 29, 2000 "without [the

product] physically leaving our premises."  (Henning Am. Rep. at 3-4.)

Moreover, Dr. Henning asserts that the impetus for the quarterly

agreement was the difficulty involved in clearing customs and ensuring that

shipments crossed prior to the end of the quarter.  (Id.)  If S-A had been capable

of ensuring that the product would clear customs prior to the end of each quarter,

then the modification of the delivery terms would arguably be unnecessary.

Therefore, the use of these quarterly modifications suggests that S-A was

incapable of clearing customs before the end of the quarter.  As such, a fact-

finder could conclude that S-A's recognition of revenue on these shipments prior

to the quarter's end was improper.  (Id. at 41.)

42

Defendants seek to rebut this inference by noting that Plaintiffs point to no affirmative evidence showing S-A's failure to satisfy any remaining obligations before recognizing revenue each quarter.  Plaintiffs respond that Defendants theoretically possess superior access to any evidence showing that such obligations were in fact satisfied, and that Defendants' failure to produce such evidence strengthens the inference above.  While not losing sight of Plaintiffs' burden, the Court agrees that, to the extent a factual dispute exists about S-A's fulfillment of its obligations, the absence of any record evidence resolving the dispute permits the Court to present the issue to the fact-finder.

Plaintiffs presented sufficient evidence that S-A improperly recognized revenue on a single shipment of $5.3 million in transmission products to Rogers Cable in the third quarter of 2001.  Record evidence indicates that in March 2001, S-A arranged a deal with Rogers Cable to ship product in March that would have typically been shipped over the subsequent four to six months, an arrangement which allowed S-A to take advantage of the sale at least one fiscal quarter earlier than normal.  The terms of this side agreement permitted Rogers Cable to delay payment until the product was moved from an off-site storage facility to Rogers Cable's main warehouse. (SOF ¶ 316; SMF ¶ 31b.)  Internal S-

43

A communications indicate that Rogers Cable had not remitted payment eight months after the shipment.  (SMF ¶ 31b, e, f.)  Plaintiffs' expert, citing SAB 101 § A.3, contends that because "a substantial portion of the sales price [was] not payable until delivery [was] made to the final site," S-A improperly recognized $5.3 million in revenue from this transaction during the third fiscal quarter. (Henning Am. Rep. at 3-7 to 3-8.)

At best, Defendants suggest that the Rogers Cable transaction might comply with GAAP under alternative criteria.  However, this relatively weak contention is insufficient to resolve the factual dispute as to the propriety of the side agreement with Rogers Cable, given the evidence detailing the terms of the agreement coupled with the expert testimony of Dr. Henning.

Therefore, considering the evidence as a whole, and construing all inferences in favor of Plaintiffs, the Court finds that Plaintiffs have presented a genuine issue of material fact as to whether Defendants committed actionable violations of GAAP, precluding summary judgment on this issue.

**IV.     Scienter**

The parties also dispute whether the record contains sufficient evidence of

scienter with respect to Defendants' alleged misrepresentations.  The Supreme

Court has defined scienter as "a mental state embracing intent to deceive,

manipulate or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12,

96 S. Ct. 1375,  47 L. Ed. 2d 668 (1976).  The PSLRA requires a plaintiff to set

forth facts that give rise to a strong inference that the defendants acted with the

required state of mind.  15 U.S.C. § 78u-4(b)(2).

In the Eleventh Circuit, liability under Section 10(b) and Rule 10b-5

requires, as a minimum, a showing of severe recklessness with regard to the risk

of misleading investors.  Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1238

(11th Cir. 2008) (quoting Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1284

(11th Cir.1999)).  A defendant's misrepresentations or omissions are severely

reckless if they involve an "extreme departure from the standards of ordinary

care" and present "a danger of misleading buyers or sellers which is either

known to the defendant or is so obvious that the defendant must have been

aware of it."  Broad v. Rockwell Int'l Corp., 642 F.2d 929, 961-62 (5th Cir.

1981).  Plaintiffs may prove such recklessness by providing evidence that

45

defendants possessed knowledge of facts or access to information contradicting their public statements, so as to prove that defendants knew or should have known that they were misrepresenting material facts related to the corporation. See Cornwell v. Credit Suisse Grp., 689 F. Supp. 2d 629, 637 (S.D.N.Y. 2010); Hall v. The Children's Place Retail Stores, Inc., 580 F. Supp. 2d 212, 227-28 (S.D.N.Y. 2008).  Moreover, the Eleventh Circuit (as well as several other circuits) has found that the PSLRA permits the aggregation of factual allegations in order to infer scienter, provided that the plaintiff can demonstrate scienter with respect to each defendant and with respect to each alleged violation. Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1017 (11th Cir. 2004); see also Bourjaily v. United States, 483 U.S. 171, 179-80, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987) ("[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts."); In re Cabletron Sys., 311 F.3d 11, 39 (1st Cir. 2002) (noting that the plaintiff may "combine various facts and circumstances indicating fraudulent intent" in order to satisfy the scienter requirement."); Abrams v. Baker Hughes, Inc., 292 F.3d 424, 431 (5th Cir. 2002) ("The appropriate analysis . . . is to consider whether all facts and

46

circumstances 'taken together' are sufficient to support the necessary strong inference of scienter on the part of the plaintiffs."); Fla. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 660 (8th Cir. 2001) ("[U]nder the Reform Act, a securities fraud case cannot survive unless its allegations collectively add up to a strong inference of the required state of mind."); Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir. 2000) ("Taken together with the allegations of poor sales and the pleadings in various lawsuits filed by GT, the Appellants have alleged sufficient facts to support a strong inference of recklessness.").

Despite Defendants' vigorous assertions that Plaintiffs provide no direct evidence on this issue, it is well established that circumstantial evidence is sufficient to support a strong inference of scienter.  See Mizzaro, 544 F.3d at 1249; Abrams v. Baker Hughes Inc., 292 F.3d 424, 430 (5th Cir. 2002); Greebel v. FTP Software, Inc., 194 F.3d 185, 195 (1st Cir. 1999); Provenz v. Miller, 102 F.3d 1478, 1490 (9th Cir. 1996).  Furthermore, issues of scienter are highly fact-specific, rendering such determinations most appropriate for the trier of fact. S.E.C. v. Merch. Capital, LLC, 483 F.3d 747, 766 (11th Cir. 2007) ("Mixed questions of law and fact, such as questions of materiality, scienter, and reliance, involve assessments peculiarly within the province of the trier of fact . . . .").

In the present case, the scienter dispute centers on whether Defendants knew of or recklessly disregarded the risk that weakening demand for S-A's products contradicted public statements regarding the strength of its sales, a risk which Defendants allegedly concealed through channel stuffing activities and revenue recognition practices in violation of GAAP.

A.    Channel stuffing

The Court will first consider the evidence of scienter with respect to the channel stuffing claims.  Here, the crucial inquiry is whether Defendants knew or recklessly disregarded the risk that S-A was sacrificing sales in later quarters by pulling those sales into earlier quarters, thereby misrepresenting the true strength of demand for S-A's products.

The crux of the channel stuffing claim is that Defendants knew of both the existence of the channel stuffing activities as well as the effect such activities would have on future sales.  (Complaint ¶¶ 182-83; Pl. Opp. at 27.)  Plaintiffs must prove that Defendants knew or "must have been aware" that such practices would result in a material decline in business going forward.  See Maldonado v. Dominguez, 137 F.3d 1, 9 n.4 (1st Cir. 1998) ("Even if plaintiffs wish to prove scienter by 'recklessness,' they still must allege . . . that defendants had full

48

knowledge of the dangers of their course of action and chose not to disclose those dangers to investors."); In re Connetics Corp. Sec. Litig., No. C 07-02940 SI, 2008 WL 3842938, at *10 (N.D. Cal. Aug. 14, 2008) (complaint adequately alleged scienter where defendant allegedly engaged in channel-stuffing activities despite knowing of customers' excessive inventories); Gavish v. Revlon, Inc., No. 00 Civ. 7291, 2004 WL 2210269, at *18 (S.D.N.Y. Sept.30, 2004) (finding that a strong inference of scienter required "that defendants were at least reckless to the fact that [the defendant-company's] future sales were being sacrificed for short-term sales").

As noted in the Court's discussion on the merits of the channel stuffing claims, Plaintiffs have produced evidence that excessive customer inventories contributed to subsequent demand declines in the fourth quarter of 2001. When S-A announced its disappointing fourth quarter results, analysts partially attributed the decline to an inventory correction, where customers tapped into bloated inventories rather than placing new orders with S-A. (SMF ¶ 35d-i.) As such, evidence indicating that Defendants knew that S-A's channel-stuffing activities risked creating the conditions for this inventory correction would support a strong inference of scienter.

AO 72A
(Rev.8/82)

Ample evidence is contained in the record in order to establish that Defendants closely monitored customer inventories.  Defendant McDonald indicated in his deposition testimony that it was standard practice for S-A's sales staff to monitor inventory levels through constant communication with customers, while Defendant Haislip likewise testified that customers routinely provided six-month rolling forecasts of their demand.  (SMF ¶ 2b.)  In addition, S-A utilized a "Weekly DSN Spreadsheet" showing shipments to and deployments from its customers, which provided S-A with visibility on customers' inventory needs.  (SMF ¶ 3g.)  This spreadsheet was distributed throughout S-A, including to Defendants McDonald and Haislip.  (Id.)  S-A also generated a quarterly "Profit and Loss" statement showing inventory possessed by its customers.  (SMF ¶ 3b, c, j.)  Such evidence demonstrates that maintaining awareness of customer inventory levels was a critical aspect of S-A's sales strategy.

The question then becomes whether Defendants appreciated the excessive nature of these inventories.  Given the evidence that S-A closely monitored inventory levels, a fact-finder could reasonably conclude that S-A likewise recognized that these inventories greatly exceeded historical levels.  Plaintiffs

bolster such a conclusion by pointing to at least one internal S-A study from April 2001, which indicated that S-A's successful efforts to pull sales into the third quarter had potentially reduced demand for its Explorer set-tops in the fourth quarter.  (SMF ¶ 19a, b.)

Taken together, this evidence supports an inference that Defendants were aware that S-A's channel stuffing activities ran the risk of outpacing demand and creating a damaging inventory correction in later quarters.

Defendants attempt to rebut this inference by reference to internal S-A forecasts consistent with its public statements regarding sales during the class period.  S-A's January 2001 forecast projected sales increases in the third and fourth fiscal quarters of 2001. (SOF ¶¶ 183-84.)  Likewise, the April forecast predicted year-over-year growth in bookings, sales, backlog, and gross margin; these targets exceeded earlier projections contained in the S-A Annual Plan. (SOF ¶¶ 202-03.)  Such forecasts presumably refute any inference of awareness on the part of S-A's management that the company's sales practices would have a material and adverse impact on future sales.

While this point is well-taken, Defendants have cited no authority (and the Court has found none) supporting the argument that evidence of consistency

between a defendant's internal forecasts and its public statements are sufficient to grant summary judgment as to scienter in the face of contrary evidence from the plaintiff.  None of Defendants' cited cases show that optimistic internal forecasts are sufficient to negate evidence that a defendant recognized the risks associated with channel stuffing activities.  Rather, these authorities support the wholly distinct proposition (inapplicable in the present case) that consistency between internal forecasts and forward-looking projections can negate scienter in a securities fraud action based on those projections.  See S.E.C. v. Merch. Capital, LLC, 483 F.3d 747, 772 (11th Cir. 2007) (declining to address the scienter issue in securities fraud claim predicated on misleading sales projections);  In re Oracle Corp. Sec. Litig., No. C 01-00988 SI, 2009 U.S. Dist. LEXIS 50995, at *67-68 (N.D. Cal. Jun. 16, 2009) (examining whether allegedly misleading sales forecast forming basis of securities fraud claim was reasonable in light of internal forecasts); In re Tseng Labs, Inc. Sec. Litig., 954 F. Supp. 1024, 1030-31 (E.D. Pa. 1996) (finding that internal forecast rendered predictions of future performance reasonable); Colby v. Hologic, Inc., 817 F. Supp. 204, 211-12 (D. Mass. 1993) (detailed internal forecasting negated

scienter in action alleging that a public forecast of a generalized nature was misleading).

Furthermore, a defendant's belief that it could continue avoiding the risks involved with channel stuffing hardly shows the absence of the defendant's awareness of that risk.  In <u>Campbell</u>, the court, confronted with sales practices similar to those in the present case, held that even if the defendant-company honestly believed that projected market growth would offset the detrimental effect of pulling in sales from later quarters, such a belief did not excuse the defendant's obligation to disclose material information relating to its sales practices.  <u>In re Campbell Soup Co. Sec. Litig.</u>, 145 F. Supp. 2d 574, 598 (D.N.J. 2001).  In so holding, the court astutely noted that "the purpose of the securities laws -- ensuring that investors have access to all material information -- would be undermined if companies were permitted to withhold materially adverse information because they believed the company's fortunes would soon turn around." <u>Id.</u>; <u>see also</u> <u>In re Connetics Corp. Sec. Litig.</u>, No. C 07-02940 SI, 2008 WL 3842938, at *10 (N.D. Cal. Aug. 14, 2008) (suggesting that artificially optimistic sales forecasts, rather than negating the scienter element, were probative of defendants' motive to engage in actionable channel stuffing).

Accordingly, in the present case, the fact that S-A projected continued growth in the market for its products is insufficient to disprove Defendants' awareness of the risks involved with S-A's channel stuffing activities.

Defendants also argue strenuously that Plaintiffs, having failed to produce testimony from any S-A customers on this point, cannot prove scienter.  (Def.'s Memo. at 37.)  However, as discussed previously, the absence of such direct evidence is not fatal where circumstantial evidence is available.  The absence of customer testimony on this point goes to the weight of the circumstantial evidence of scienter, an issue more properly reserved for the fact-finder.  See Provenz v. Miller, 102 F.3d 1478, 1490 (9th Cir. 1996) ("[S]ummary judgment on the scienter issue is appropriate *only* where 'there is no rational basis in the record for concluding that any of the challenged statements was made with [the] requisite scienter.'").

B.    GAAP Violations

Similarly, the evidence supports the conclusion that Defendants possessed the necessary scienter with respect to S-A's alleged accounting violations.  As a general rule, summary judgment is inappropriate where expert testimony supports the nonmoving party's case.  See Provenz v. Miller, 102 F.3d 1478,

54

1490 (9th Cir. 1996) ("Not only have plaintiffs provided documentary evidence that suggests that defendants may have recognized revenue before it was earned, they also provided expert testimony in support of their contentions. This evidence is sufficient to overcome summary judgment."); see also Fine v. American Solar King Corp., 919 F.2d 290, 297 (5th Cir. 1990) (finding triable issue of fact as to whether revenue recognition policies rendered public statements misleading where expert testified that defendant's accounting treatment could not be included within "the universe of acceptable practices under GAAP"); Simpson v. Specialty Retail Concepts, Inc., 908 F. Supp. 323, 328 (M.D.N.C. 1995) (denying summary judgment where expert testimony established GAAP violations and documentary evidence presented questions about completeness of external audit by defendants' expert).  If the non-movant has presented such expert testimony, then in order to overcome this rule, the record evidence must clearly rebut any inference of bad faith on the part of the defendant.  Cf. In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1426 (9th Cir. 1994) ("An expert's conclusory allegations that a defendant acted with scienter are insufficient to defeat summary judgment where the record clearly rebuts any inference of bad faith.").

55

Here, Plaintiffs cite expert testimony detailing the recognition of revenue on several transactions in violation of GAAP.  As noted in the Court's discussion on the merits of these claims, Dr. Henning's report conclusively states that S-A improperly recognized revenue on its quarterly Juarez shipments to Time Warner as well as its third quarter sale to Rogers Cable.  Plaintiffs have thereby satisfied their burden of production on the scienter requirement for these transactions.

As such, Defendants must show that the record evidence clearly rebuts the inference of bad faith created by Dr. Henning's testimony.  Defendants have correctly noted that mere violations of GAAP, standing alone, are insufficient to demonstrate scienter in a Section 10(b) securities fraud action.  See In re Miller Indus., Inc., 120 F. Supp. 2d 1371, 1382 (N.D. Ga. 2000).  Rather, plaintiffs must show "that no reasonable accountant would have made the same decision *if confronted with the same facts*."  Id. (emphasis added).  Where courts have found that a GAAP "violation" amounted to little more than a difference in professional accounting judgments, a dispositive point has often been the nature of the various accountants' access to all relevant facts.  Compare Provenz, 102 F.3d at 1491 (finding issue of fact as to scienter where evidence suggested that

56

defendants failed to disclose material information to their accountant) with Worlds of Wonder, 35 F.3d at 1426-27 (upholding summary judgment where plaintiffs' expert conceded that auditors made a sufficient, fully-informed investigation into disputed transactions).

In Worlds of Wonder, the defendant clearly rebutted the inference of scienter by showing that it "extensively investigated, carefully addressed, reasonably resolved, and thoroughly documented every transaction where Plaintiffs allege revenue was improperly recognized." Worlds of Wonder, 35 F.3d at 1425(quoting In re Worlds of Wonder Sec. Litig., 814 F. Supp. 850, 870 (N.D. Cal. 1993)).  Accordingly, the court held that summary judgment was proper, finding that once the plaintiff had conceded the sufficiency of the opposing auditors' investigation, any dispute as to the correctness of the auditors' ultimate resolution of the underlying accounting issues became moot. Id. at 1426; see also Miller, 120 F. Supp. 2d. at 1379 (finding that the testimony of defendant's auditor, which detailed the precise effects of a prior judgment on the defendant's quarterly earnings, sufficiently rebutted plaintiff's expert testimony, which "relied entirely upon speculation and conjecture" about how the judgment "may have" affected defendant's earnings).

Conversely, in <u>Provenz</u>, the court noted that where defendants withhold

material information from their accountants, defendants cannot proffer their

reliance on their accountant's advice as proof of good faith.  <u>Provenz</u>, 102 F.3d

at 1491.  In addition, the court distinguished <u>World of Wonder</u>, limiting its

application to cases where "defendants have provided *unrebutted* evidence

showing that their accountants had full knowledge of the disputed transactions."

<u>Id.</u> (emphasis in original).

The rule that emerges from these cases is that the defendants' accountants

must be aware of all relevant facts concerning a disputed transaction in order for

a difference in the professional judgment of reasonable accountants to clearly

rebut an inference of bad faith.

With respect to S-A's quarterly agreements with Time Warner, the critical

inquiry for determining the propriety of the accounting treatment is whether S-A

fulfilled all of its consequential obligations prior to recognizing revenue from its

Juarez shipments.  As noted above, Defendants have failed to cite evidence that

S-A satisfied these obligations.  By extension, no record evidence indicates that

any auditor verified S-A's compliance.  Therefore, Defendants can hardly

demonstrate that S-A's auditors conducted a thorough investigation that accounted for all the relevant facts.

Defendants attempt to fill this information gap by citing evidence that external auditors were fully aware of the terms of the quarterly agreement, and approved such terms.  Defendants cite working papers from Arthur Andersen ("AA"), where auditors noted the existence of the quarterly agreement with Time Warner.  (Def.'s Memo. at 50; SOF ¶¶ 309-10.)  Defendants also cite evidence that a second external auditor, Ernst & Young ("E&Y"), affirmatively stated that S-A properly recognized revenue on the disputed Time Warner transactions after reviewing "various letter agreements" amending S-A's collective agreement with Time Warner.  (SOF ¶ 311; SMF Ex. 47v: Letter from Ernst & Young LLP to Wallace Haislip, Senior Vice President and Chief Financial Officer, Scientific-Atlanta, Inc. (July 17, 2002).)

In response, Plaintiffs assert that Defendants have failed to show that these external auditors actually tested either the sufficiency of the accounting treatment or S-A's fulfillment of its obligations under the agreement prior to the end of each fiscal quarter, the auditors' awareness of the agreements terms notwithstanding.  (Pl. Opp. at 48-49.)

The Court agrees with Plaintiffs' position.  Defendants' arguments regarding the auditors' knowledge of the quarterly agreement's existence fails to resolve the dispositive question, i.e. whether AA or E&Y determined that S-A had in fact complied with the agreement before recognizing revenue. Defendants' briefs are silent on this point.  While there may be a colorable argument that the approval of S-A's accounting practices implies that both sets of auditors fully investigated the underlying facts of these transactions, Defendants cite no record evidence explicitly showing that its external auditors conducted such an investigation.  Instead, Defendants fall back on the generalized statements that AA approved S-A's overall accounting program. (SOF ¶¶ 284, 293.)  These broad endorsements do little to clarify what knowledge AA had about the details of the Time Warner transactions.

Likewise, Defendants have failed to show that S-A's external auditors were aware of the allegedly improper side agreement with Rogers Cable. Plaintiffs cite evidence that AA, in its audit of S-A's dealings with Rogers Cable, was under the impression that there existed no side agreements modifying the parties' original contract.  (SMF ¶ 30d.)  AA obtained its information as to the existence of any such side agreements from S-A's director of finance for

60

North America sales, who was also unaware of the side agreement.  (Id. ¶¶ 18l, p, 30d.)  Given the ample testimonial and documentary evidence of the side agreement's existence, the fact that AA expressed no knowledge of the agreement raises a material question of fact as to the sufficiency of its investigation into the Rogers Cable transaction.

Defendants' sole response is that when AA conducted revenue testing on one of the invoices associated with this purchase order, AA raised no questions about S-A's accounting practices.  (SOF ¶ 323.)  However, since AA's working papers reflected that no side agreement with Rogers Cable existed, Defendants can hardly claim that AA condoned the recognition of revenue pursuant to this agreement.

Examining this evidence in the light most favorable to Plaintiffs, the Court concludes that Defendants have, at most, shown that independent auditors endorsed S-A's overall accounting program, and that such auditors were aware of some circumstances surrounding the questionable revenue recognition practices.  Unlike in the Worlds of Wonder case, where two sets of accountants presented with the same data reached different conclusions, Defendants have failed to present evidence that S-A's auditors reached a different conclusion than

(Rev.8/82)

Plaintiffs' expert after analyzing all the relevant information associated with the questionable transactions.  As such, the Court is not presented with the sort of fully-informed outside review of the alleged GAAP violations that would compel a finding of summary judgment on this issue.

      C.    <u>Aggregation</u>

Finally, to the extent that either allegation of scienter standing alone suffers from an insufficient quantum of evidence, the consideration of all relevant evidence in the aggregate sufficiently compensates for any weakness in each free-standing claim.  Plaintiffs may aggregate relevant facts and reasonable inferences to demonstrate that a defendant acted with scienter.  <u>See</u> <u>Phillips v. Scientific-Atlanta, Inc.</u>, 374 F.3d 1015, 1017, 1018 n. 6 (11th Cir. 2004).  As such, while accounting violations may be insufficient by themselves to satisfy the scienter requirement, coupling such violations with other evidence of fraud (e.g., channel stuffing practices) is sufficient to create a strong inference of scienter.  <u>See</u> <u>In re AFC Enters., Inc. Sec. Litig.</u>, 348 F. Supp. 2d 1363, 1372 (N.D. Ga. 2004) (indicating that GAAP violations could establish scienter when accompanied by other circumstances, such as a profound overstatement of a company's financial results or issuance of a restatement).

Moreover, the Court also recognizes that summary judgment on the scienter issue is appropriate only where "there is no rational basis in the record for concluding that any of the challenged statements was made with requisite scienter." In re Software Toolworks, Inc., 50 F.3d 615, 626 (9th Cir. 1994) (quotations and citations omitted).

The Court would be hard-pressed to find that Defendants have satisfied such an exacting standard. Considered as a whole, the record evidence supports an inference that Defendants publicly presented an image of S-A's robust sales and revenues despite knowing that this position was unsustainable over the long term, thereby concealing information from investors that would have alerted them to that risk.

An instructive analogue to the present case is the decision in In re Campbell Soup Co. Securities Litigation. The plaintiffs in Campbell alleged a comprehensive scheme consisting of improper sales and accounting practices used to boost sales and earnings numbers. In re Campbell Soup Co. Securities Litigation, 145 F. Supp. 2d 574, 596 (D.N.J. 2001). The defendants, in order to "to achieve ever-increasing sales and meet analysts' estimates," allegedly engaged in aggressive sales practices in order to convince customers to purchase

more product than those customers required.  Id. at 597.  The defendants would

then utilize improper accounting procedures in order to disguise the impropriety

of these sales techniques.  Id.  In denying the defendants' motion to dismiss, the

Campbell court found that while the defendants' alleged accounting violations

alone were insufficient to establish scienter, allegations of the defendants'

"financial legerdemain" and "improper [sales] practices," when considered

together, clearly gave rise to a strong inference that the defendant-company

acted recklessly in failing to disclose material aspects of its operations and

performance."  Id. at 597-98.

In the present case, Plaintiffs have cited evidence supporting the following

allegations: (1) S-A aggressively pulled in sales from later quarters; (2) S-A was

aware of customers' growing inventories; (3) an internal study suggested that the

practice of pulling in sales would negatively impact fourth quarter demand; (3)

S-A modified its contract with Time Warner on a quarterly basis in order to

recognize revenue before the quarter's end; (4) S-A improperly recognized

revenue several months in advance on a shipment to Rogers Cable; (5) S-A's

revenue recognition practices violated GAAP; and (6) these accounting

violations did not result from mere differences in professional judgment by reasonable accountants.

Considering this evidence as a whole, the Court finds no meaningful distinction between the present case and Campbell.  Plaintiffs have sufficiently supported their allegations that "[S-A's] executives and the sales force scrambled and schemed to convince their customers to purchase more and more product, far more than those customers needed," and then "engaged in financial legerdemain to realize the sales as revenue and mask the improprieties of their sales tactics."  Campbell, 145 F. Supp. 2d at 597.  In the face of such evidence establishing a material question of fact as to Defendants' scienter, the Court declines to grant summary judgment on this issue.

## V.  Loss Causation

Finally, Defendants contend that summary judgment is proper because Plaintiffs cannot satisfy their burden of proving loss causation.  In order to prove loss causation, a plaintiff must show a causal connection between the material misrepresentation and the loss.  Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005).  Establishing such a causal

connection requires the plaintiff to satisfy a two-pronged test.  First, the plaintiff

must show correction of the alleged fraud.  See Archdiocese of Milwaukee

Supporting Fund, Inc. v. Halliburton Co., 597 F.3d 330, 336 (5th Cir. 2010)

("Causation therefore requires the Plaintiff to demonstrate the joinder between

an earlier false or deceptive statement, for which the defendant was responsible,

and a subsequent corrective disclosure that reveals the truth of the matter . . . .");

cf. Robbins v. Koger Props., Inc., 116 F.3d 1441, 1448-49 (11th Cir. 1997)

(finding no loss causation where defendants' public statements resulting in

stock's decline were unrelated to any earlier misrepresentations).  Second, the

plaintiff must demonstrate a causal link between this correction and the

plaintiff's subsequent loss.  See Dura, 544 U.S. at 347 (holding that satisfaction

of the loss causation requirement requires the plaintiff to demonstrate that a loss

occurred "after the truth became known" with respect to the misrepresentations

or omissions set forth in the pleadings).

     A.     Correction of the Fraud

In the present case, the parties differ as to the method by which the earlier

fraud must be corrected in order to establish loss causation.  Defendants argue

that S-A must have either expressly admitted any misrepresentations, expressly

AO 72A
(Rev.8/82)

corrected any statements of historical fact, or expressly revealed that past results were owed to undisclosed accounting or sales practices.  (Def.'s Memo. at 65; Reply Memo. at 61-62.)  Plaintiffs reject such a strict rule, arguing instead that it is sufficient for some later event to reveal new information to the market that was concealed by S-A's earlier misrepresentation.  (Pl. Opp. at 86-87, 92).

While the Eleventh Circuit has not expressly addressed this question, other jurisdictions have rejected Defendants' approach.  The Tenth Circuit has recently held that a corrective disclosure "need not precisely mirror the earlier misrepresentation," requiring only that the disclosure "relate back" to the misrepresentation.  In re Williams Sec. Litig.-WCG Subclass, 558 F.3d 1130, 1140 (10th Cir. 2009).  Subsequently, the Fifth Circuit, citing Williams favorably, refused to require a "fact-for-fact" disclosure of information fully correcting earlier misstatements.  See Alaska Elec. Pension Fund v. Flowserve Corporation, 572 F.3d 221, 229-31 (5th Cir. 2009).  Rather, the court found it sufficient for the disclosure to reveal "part of the 'relevant truth'--the truth obscured by the fraudulent statements."  Id. at 229-30 (finding that where the defendant's reduced earnings estimates showed that prior guidance was inaccurate and that other negative information did not cause a decline in stock

67

price, the plaintiff need not directly show that earlier guidance was fraudulent).

In addition, at least one district court of the Seventh Circuit has rejected

Defendants' proposed rule.  See In re Motorola Sec. Litig., 505 F. Supp. 2d 501,

542-43 (N.D. Ill. 2007) (finding a plaintiff may still establish loss causation

where a corrective disclosure does not, on its face, specifically identify or

explicitly correct a previous representation).

The Second Circuit's jurisprudence indicates a similarly permissive

approach.  In cases involving allegedly fraudulent omissions, courts have not

required a specific "corrective disclosure" where some other event results in the

materialization of the risk that is allegedly concealed through a defendant's

omissions.  In practice, the loss causation analysis focuses on whether some later

event revealed material information concealed by the defendant's

misrepresentation.  See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172-77

(2d Cir. 2005) (requiring that the disclosure reveal that the defendant's

"misstatement or omission concealed something from the market that, when

disclosed, negatively affected the value of the security").  In Lentell, the Second

Circuit identified the event which revealed the previously-concealed information

as the "materialization of the risk" concealed by earlier misrepresentations.  See

Lentell, 396 F.3d at 173.  While such an event may take the form of a traditional

corrective disclosure expressly admitting to an earlier fraud, it need not

necessarily do so in order to satisfy loss causation requirements.  See In re

Vivendi Universal, S.A. Sec. Litig., 605 F. Supp. 2d 586, 598 (S.D.N.Y. 2009).

External events, such as a ratings downgrade that reveals the risk of deteriorating

liquidity, may also suffice.  Id.  The form of the event is immaterial; the relevant

inquiry is whether the later event, by some mechanism, "disclose[s] part of the

truth that was previously concealed by the fraud."  Id.  (finding genuine issue of

material fact existed as to whether credit ratings downgrades and quick asset

sales within eleven day period materialized the concealed risk of defendant's

severe liquidity crisis).

   In the face of such extensive case law undercutting their proposed rule,

Defendants have cited to two authorities providing weak support for their

position while failing to contradict the rule utilized in other jurisdictions.

Defendants first cite In re Retek Inc. Securities Litigation, where the plaintiffs

failed to establish that their loss resulted from misleading public statements

about the defendant-company's financial condition.  In re Retek Inc. Sec. Litig.,

621 F. Supp. 2d 690, 708 (D. Minn. 2009).  The Retek plaintiffs argued that a

press release discussing the current financial condition of the defendant-

company disclosed the fact that the defendants had engaged in improper revenue

recognition practices in order to conceal the company's true financial outlook.

Id. at 692.  The court rejected this argument, finding that the purported

corrective disclosure failed to provide any new information on the defendant-

company's accounting practices, and ultimately granted summary judgment on

the issue of loss causation.  Id. at 708.  The court did not suggest that the

plaintiff's case failed for want of an express admission of fraud; indeed, the

court noted that "the relevant truth [concealed by the defendant's

misrepresentations] may be disclosed directly or indirectly." Id. at 699.  Rather,

what proved fatal to the plaintiff's case was the absence of evidence showing

that the market recognized a link between the disclosure and the underlying

fraud.  See id. at 702-03.  Therefore, Retek does not support Defendants'

proposed rule.

Defendants' reliance on In re Omnicom Group, Inc. Securities Litigation

is similarly misplaced.  There, the plaintiffs argued that the defendant-

company's spin-off of two parts of its business was a sham and that the

company's subsequent announcements that it intended to buy back those parts of

70

its business constituted disclosure of the alleged fraud.  See In re Omnicom Grp.,

Inc. Sec. Litig., 541 F. Supp. 2d 546, 552-53 (S.D.N.Y. 2008).  The court found

that this announcement did not correct any earlier misrepresentation, as the mere

fact that the defendant-company intended to buy back these businesses did not

suggest any fraud with respect to its initial decision to spin them off.  See id. at

553.  Here again, the critical failing was the absence of any new information in

the"corrective" disclosure rather than the absence of an express repudiation of

earlier misstatements.  While the Omnicom court found that the disclosure at

issue was not corrective because it did not "reveal the falsity of the alleged

misstatements," no language in the opinion suggests that only an express

admission of fraud would have constituted an adequate disclosure.  See id. at

552-53.  As in Retek, the court noted that "a disclosure need not reflect every

detail of an alleged fraud," although "it must reveal some aspect of it."  Id. at

551.  As such, neither of the cited authorities support Defendants' rigorous

requirements in a corrective disclosure and are in fact consistent with the more

permissive rule advocated by Plaintiffs.

Furthermore, as the Fifth Circuit noted in Flowserve, Defendants'

proposed rule would allow wrongdoers to avoid liability by merely refusing to

AO 72A
(Rev.8/82)

admit the falsity of prior misstatements.  See Flowserve, 572 F.3d at 230.  As

one court has discussed:

> A company that has, for example, booked revenue from non-existent
>
> contracts could simply issue some damaging announcement that appears
>
> on its face unrelated to any fraudulent scheme, e.g., a significant earnings
>
> warning citing order weakness, wait for its share price to plummet, and
>
> then disclose the wrongdoing once the damage has been done. The
>
> plaintiff would be unable to tie its loss, i.e., the share price decline, to the
>
> fraud, rather than to the apparently unrelated announcement.

Motorola 505 F. Supp. 2d at 544.  Indeed, such a rule would bar any securities

fraud action lacking an express admission of fraud on the part of repentant

defendants.

Therefore, having reviewed the case law and the arguments of the parties,

the court adopts the rule articulated in Flowserve that a corrective disclosure

need not specifically address the falsity of prior statements.  So long as a later

disclosure reveals new information which an earlier omission fraudulently

concealed, it is immaterial whether the disclosure contains an express admission

of prior fraudulent conduct.  See also In re Teco Energy, Inc. Sec. Litig., No.

8:04-CV-1948-T-27EAJ, 2006 U.S. Dist. LEXIS 73833, at *23-24 (M.D. Fla.

Oct. 10, 2006).

      In the present case, Plaintiffs cite three disclosures that revealed the

weakness in demand for S-A's products that were concealed by earlier public

statements.  On July 19, 2001, S-A issued a press release disclosing that,

although earnings and other financial metrics had exceeded its expectations, its

total bookings for the fourth fiscal quarter had declined over the previous year's

fourth quarter.  (SMF ¶ 33a.)  In its press release, S-A attributed the decline in

bookings to "the uncertain economic climate and reduced digital marketing

efforts by cable operators during the slower summer vacation period, *in addition

to customer inventory levels* and the slower than expected deployment of

interactive applications." (<u>Id.</u> (emphasis added).)  On the same date, during the

conference call discussing the press release, Defendant McDonald told investors

that S-A's customers "probably moved early in the year to get the product" and,

as the fourth quarter progressed, likely began absorbing inventory that had

accumulated during the previous quarter.  (<u>Id.</u> ¶ 33b.)

      The third disclosure occurred on August 16, 2001.  On that date, S-A filed

its 2001 Form 10-K, disclosing in a press release that it anticipated adverse

effects on its results in fiscal 2002 even though its customers had recently reaffirmed or increased their estimates of new digital subscribers to be added through the end of calendar year 2001. (SOF ¶ 231.) The press release attributed a decline in demand to customers' accumulation of inventories during calendar years 2000 and 2001, as well as to the declining economy.

Plaintiffs assert that these disclosures revealed to the market not only that demand was declining, but that such declines were attributable to excessive customer inventories resulting from S-A's channel stuffing practices. (Pl. Opp. at 94.) The new information regarding accumulated customer inventories allegedly revealed that these sales practices had concealed weakening demand for S-A's products in earlier public statements. (Id.)

In support of this contention, Plaintiffs cite several reports in the days following the July 19 and August 16 statements where analysts discussed the detrimental impact of excessive customer inventories on future demand for S-A's products.

In a report issued July 20, 2001, Gerard Klauer Mattison & Co. stated, "MSOs lowered digital STB inventory; *further field inventory correction expected*. . . . Field inventory is now estimated at 1.3 million units, or 14 weeks

of installations. We believe the desired range is 4-6 weeks. Therefore, we

anticipate shipments will fall below install rates for the foreseeable future . . . ."

(SMF ¶ 35d.)

A second analyst report from July 20 expressed similar sentiments:

"What we didn't anticipate was how quickly and how sharply the growth would

fall off for SFA. We attribute this sharp fall off primarily to over-ordering of

settops by MSOs in the December and March quarters. As a result, . . . we

expect a significant decline in [year-over-year] revenue and earnings."

(SMF ¶ 35e.)

The corrective nature of these disclosures is most clearly evident in an

August 16 report from analyst UBS Warburg (US):

Yesterday's 10-K filing by Scientific-Atlanta (S-A) calls into question

two things. *First, channel inventories, and second, end user demand.* . . .

So with inventories coming down 20 days in the second half of 2001,

what could be wrong with this analysis? The simple answer is that the

absolute level of inventories may still be too high to begin with. . . . *There*

*appears to be no reasonable case yet for an annualized slowdown of*

*consumer demand, whether due to the recession or other secular*

> *saturation reasons. . . .* With a healthy demand picture, in our view, *any*
>
> *further weakness in set-top box shipments in the second half of 2001 must*
>
> *come from a greater-than-anticipated inventory correction.*

(SMF ¶ 35g (emphasis added).)

These reports demonstrate that the July and August statements revealed the excessive inventories associated with Defendants' alleged undisclosed channel stuffing activities.  Analysts following S-A clearly reacted with surprise to the new information regarding customer inventory levels, and clearly understood the import of S-A's suggestion that such excess inventories accounted, at least in part, for the decline in demand.  Regardless of whether analysts understood that channel stuffing was the cause of such excessive inventories, these disclosures revealed at a minimum that Defendants' statements from January and April 2001 obscured the degree to which the apparent demand was bolstered by S-A's channel stuffing practices.

However, the Court agrees with Defendants that these disclosures fail to establish a causal link between Defendants' accounting violations and the drop in S-A's stock price.  As in <u>Retek</u>, Plaintiffs' cited disclosures provided the market with no new information about S-A's accounting practices.  Thus,

AO 72A
(Rev.8/82)

Plaintiffs cannot demonstrate that the removal of any inflationary component in the stock price resulted from a disclosure of these practices.  Accordingly, because Plaintiffs have failed to put forward evidence of loss causation as to Defendants' GAAP violations, the Court grants summary judgment to the extent that Plaintiffs' claims rely on such violations.

>   B.      Disaggregation of Plaintiffs' Losses from Non-Fraud Related
>           Events

The Court is ultimately left with the question of whether Plaintiffs have presented a genuine issue of fact as to whether a causal connection exists between the disclosures revealing the effects of Defendants' alleged channel stuffing activities and the subsequent drop in the price of S-A's stock. Defendants have argued that Plaintiffs, in order to prevail at summary judgment, must offer evidence disaggregating the detrimental effect of the alleged fraud from that of other, non-fraud-related events upon Plaintiffs' investment. Plaintiffs argue that they need not exclude other possible causes of the stock's decline in order to survive summary judgment.

The precise issue of what a plaintiff must show in order to survive summary judgment on the loss causation issue has not been addressed in this

circuit.  The leading authority is the Eleventh Circuit's decision in Robbins v. Koger Properties, Inc., reviewing the lower court's denial of a judgment as a matter of law on loss causation grounds.  Robbins v. Koger Props., Inc., 116 F.3d 1441, 1446 (11th Cir. 1997).  In addressing the loss causation issue, the Eleventh Circuit held that, due to the "many different, complex, and often unknowable factors" affecting the value of a stock, a plaintiff need not show that the defendant's fraud was "the sole and exclusive cause of the injury [the plaintiff] has suffered," but rather that the fraudulent conduct was a substantial (i.e., contributing) cause of the stock's decline in value.  Id. at 1447.

In Robbins, the defendant-auditors allegedly misrepresented the defendant-company's cash flow, allowing for the payment of higher dividends to investors.  The plaintiffs alleged that this misrepresentation of the company's cash flow and ability to pay dividends at a given rate created an artificially high price at which plaintiffs purchased the company's stock.  Id. at 1445.  The plaintiffs' stock declined in value after the defendant company announced a dividend cut; however, in its public statements announcing the dividend cut, the defendant denied any problems in cash flow, and therefore did not correct the earlier alleged misrepresentation.  Id.

The court ultimately held that plaintiff failed to offer evidence that connected the defendant's misrepresentations to any decline during the class period and thus failed to prove that the misrepresentations were a substantial cause of the stock's decline.  Id. at 1448.  In so holding, the court focused on the plaintiffs' failure to show that any price inflation resulting from misleading statements regarding company cash flow levels had been removed from the market price during the class period.  Id.

Therefore, in Robbins, the Eleventh Circuit's decision relied more on the absence of any correction of the fraud than on insufficient proof that the fraud was a substantial cause of the plaintiff's loss.  The plaintiffs failed to demonstrate that defendant's misrepresentation played any role in the loss, let alone a substantial one, when no information revealing the misrepresentation came to light during the class period.  See id. at 1448-49 (noting that the minutes of the defendant's board meeting attributed the dividend cut resulting in the stock's decline to factors other than the cash flow, which was the subject of the misrepresentation).  As such, this decision, which implicitly relies on the absence of any corrective disclosure, provides little guidance in applying its rule

to the current case, where Defendants argue that Plaintiffs' evidence fails to account for competing causes.[9]

Other jurisdictions have split on the question of whether, in addition to providing affirmative evidence that the defendant's fraudulent conduct caused the plaintiff's loss, plaintiffs must also offer evidence at summary judgment which excludes competing, non-fraudulent causes. The Seventh Circuit has adopted the most plaintiff-friendly rule on this issue. In <u>Caremark, Inc. v. Coram Healthcare Corp.</u>, the Seventh Circuit, in finding that the plaintiffs' complaint adequately pleaded loss causation, also held that at a future summary judgment stage, the defendant could win on loss causation only "by establishing that the decline in the value of the security *is attributable in total* to some other factor." <u>Caremark, Inc. v. Coram Healthcare Corp.</u>, 113 F.3d 645, 649-50 (7th Cir. 1997) (emphasis added).

---

[9] Only one district court in the Eleventh Circuit has cited <u>Robbins</u> in the context of summary judgment. In <u>In re MIVA, Inc.</u>, the Middle District of Florida found that, in the absence of evidence attributing any portion of the inflated stock price to the defendant's misrepresentation, the plaintiff failed to show that these misrepresentations were a substantial or significant contributing cause of the plaintiff's loss. <u>See</u> <u>In re MIVA, Inc.</u>, No. 2:05-cv-201-FtM-29DNF, 2009 WL 3821146, at *12 (M.D. Fla. Nov. 16, 2009). Here again, the court's decision hinged on the lack of evidence supporting the fraud-related cause of the loss rather than plaintiff's failure to discount non-fraud-related causes and is therefore of little assistance in the present case.

80

In contrast, other circuits have looked to the plaintiff at the summary judgment phase to exclude loss causation factors unrelated to the fraud.  In <u>In re Williams</u>, the Tenth Circuit held that the plaintiffs failed to establish loss causation where the corrective disclosures contained both information revealing the alleged fraud and information related to non-fraud-related factors that would have affected the investment's value.  <u>In re Williams Sec. Litig.-WCG Subclass</u>, 558 F.3d 1130, 1143 (10th Cir. 2009).  The court found unpersuasive argument that the presence of multiple causes, some of which included fraud, created a genuine issue of fact precluding summary judgment.  The court instead found that a jury's conclusion as to whether the loss resulted from the fraud as opposed to other factors "would be no less speculative and unreliable if reached by jurors than when reached by [plaintiffs' expert]."  <u>Id.</u>

In so holding, the Tenth Circuit relied on several decisions from the Second Circuit.  While the Second Circuit has not addressed the role of confounding news at the summary judgment stage, the court upheld a motion to dismiss a complaint where the plaintiffs failed to allege that a corrective disclosure was the proximate cause of the plaintiffs' loss, as opposed to other potentially damaging statements released the same day "that were much more

81

consequential and numerous." <u>Lattanzio v. Deloitte & Touche LLP</u>, 476 F.3d 147, 158 (2d Cir. 2007) (noting also that the complaint was deficient in failing to allege facts allowing a fact-finder to ascribe some rough portion of the loss to Defendants).

Moreover, the Southern District of New York has repeatedly required plaintiffs to disaggregate non-fraud factors when deciding loss causation issues at the summary judgment stage.  The court found that plaintiffs had met this burden in <u>In re Vivendi Universal, S.A. Securities Litigation</u>, where the plaintiffs' expert conducted a regression analysis factoring out the effects of any other company-specific information released on days when the plaintiffs' investment experienced declines.  <u>In re Vivendi Universal, S.A. Sec. Litig.</u>, 605 F. Supp. 2d 586, 604-05 (S.D.N.Y. 2009).  In so holding, the court found it dispositive that the defendants failed to point to an obvious competing cause for the plaintiffs' loss on the days identified.  <u>Id.</u> at 605.  The court also emphasized that a plaintiff need only disaggregate some rough percentage of the declines resulting from non-fraud-related events rather than the precise amount of loss attributable to the defendant's fraudulent conduct.  <u>Id.</u> at 600.

AO 72A
(Rev.8/82)

The same court has also held that plaintiffs' loss causation analysis must discount negative characterizations of previously known information.  See In re Omnicom Grp., Inc. Sec. Litig., 541 F. Supp. 2d 546 (S.D.N.Y. 2008).  In Omnicom, the defendant company's stock dropped following the resignation of one of its directors and the onset of rumors of a negative Wall Street Journal article. See id. at 548.  When the article was released the following week, it reported that the defendant-company avoided losses by shifting failing investments into a holding company and that the director's resignation occurred amid questions regarding the handling of this transaction.  In addition, two accounting professors quoted in the article explicitly questioned the propriety of the transaction.  This resulted in further declines in the defendant's stock.  Id. at 548-50.

The court emphasized that when a corrective disclosure accompanies several pieces of new information released to the market simultaneously, plaintiffs must disaggregate the market's negative reaction to the corrective disclosure in particular from other confounding factors affecting stock price. See id. at 553-54.  In order to do so, the Omnicom plaintiffs relied on an event study by Dr. Scott Hakala, Plaintiffs' loss causation expert in the present case.  Dr.

Hakala attempted to discount the article's effect by noting that, "[w]hile the article also reasserted concerns regarding Omnicom's organic growth, cash flow, put obligations and earn-outs, those issues had previously been identified and fully [ sic ] in analyst and news reports . . . well before [the WSJ Article]."  The court rejected this event study as inadequate, noting that while the information contained within the article may not have been new, the negative *characterization* of previously known facts was an additional confounding factor that Hakala's analysis omitted altogether.  Consequently, the court found that the Omnicom plaintiffs had failed to satisfy their burden with respect to loss causation.  See id. at 554.

A footnote in Robbins suggests the Eleventh Circuit's approach to situations where multiple causes may have resulted in the stock's decline.  In dicta, the court noted that while a plaintiff may establish loss causation without showing that a misrepresentation was the sole reason for the investment's decline in value, the plaintiff may only recover those damages actually caused by the misrepresentation.  See Robbins, 116 F.3d at 1447 n.5.  The court further concluded that in order to establish the amount of recoverable damages, other contributing factors to the decline must be isolated and removed.  Id.  The Court

84

emphasized that loss causation, which did not require the isolation of contributing forces, was a distinct inquiry from the determination of damages, which did require such isolation.  Id.

Defendants contend that the Supreme Court has explicitly rejected the Robbins standard.  In Dura, the Court held that in order to satisfy the PSLRA's pleading requirements with respect to loss causation, plaintiffs must allege that the defendants' conduct resulted in a fraudulently inflated stock price and that a decline in the stock's value resulted from the disclosure of facts underlying  the fraud.  See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005).  In so holding, the Court rejected the reasoning of the Ninth Circuit, which had held that plaintiffs must only show that a misrepresentation "touches upon" the reasons for an investment's decline in value.  Broudo v. Dura Pharms., 339 F.3d 933, 937-38 (9th Cir. 2003).  The Court noted that because a decline potentially reflects a "tangle of factors," – including "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events" –  an allegation that the fraudulent conduct merely "touches upon" a loss is

AO 72A
(Rev.8/82)

insufficient to show that the misrepresentation caused the loss.  <u>Dura</u>, 544 U.S. at 343.

The Eleventh Circuit, in <u>Robbins</u>, used the same "touches upon" phrase in the course of explicating its "substantial factor" rule.  <u>See</u> <u>Robbins</u>, 116 F.3d at 1447.  Defendants seize on this language to argue that <u>Dura</u> amounts to an express repudiation of the <u>Robbins</u> rule on loss causation.  (Reply Memo. at 77-78.)

While the Court agrees that <u>Dura</u> requires plaintiffs to plead something more than the tenuous causal connection suggested by the "touch upon" language, it is reluctant to read <u>Dura</u> as requiring a wholesale rejection of the "substantial factor" standard.  At least one district court has limited <u>Dura</u>'s application in the context of summary judgment proceedings, noting that the Court "did not address [in <u>Dura</u>] what loss causation requires of a securities fraud plaintiff beyond the pleading stage."  <u>In re Motorola Sec. Litig.</u>, 505 F. Supp. 2d 501, 550 (N.D. Ill. 2007).[10]  The Court agrees that <u>Dura</u>, which

_____

[10]The court likewise rejected the rule proposed by Defendants in the present case, finding that the Supreme Court's discussion of other factors was intended to "[provide] a rationale to support its observation that an inflated purchase price, standing alone, does not necessarily indicate that a later loss was caused by a misrepresentation," but did not require plaintiffs to "rule out all other factors that may have contributed to the loss following a disclosure." <u>Motorola</u>, 505 F. Supp. 2d at 549-50.  As such, the court held that <u>Dura</u> did not disturb the

86

centered on the adequacy of pleading, did not establish any clear standard with respect to summary judgment so as to supplant Robbins in its entirety.

By the same token, while the Dura decision may not have invalidated the Robbins "substantial factor" test, the Supreme Court did signal that plaintiffs' allegations must satisfy some critical threshold above a mere showing that the defendants' fraudulent conduct had some amorphous, unquantified impact on the price of the stock.  Although the Eleventh Circuit has clearly stated that fraudulent conduct need not be the sole cause of the plaintiff's loss, the requirement that the fraud play a "substantial" role in the loss is consistent with a rule that the plaintiff must provide some rough measure of the effect of the fraud versus other non-fraud-related factors.  Dura  reinforces and clarifies the substantiality requirement by foreclosing theories of causation which rely on the rejected "touch upon" standard.

Moreover, while the Court remains cognizant of the Eleventh Circuit's admonition that the loss causation and damages inquiries are separate and discrete, Dura teaches that the loss causation analysis is to some extent

_____

Seventh Circuit's Caremark rule that *defendants* bear the burden on summary judgment of excluding the misrepresentation as a cause of any loss. See id. at 550-51.

dependent upon the determination of recoverable damages.  In <u>Dura</u>, the

Supreme Court treated proof of the plaintiff's actual economic loss as part and

parcel of the loss causation inquiry.  In its discussion of the PSLRA's history,

the Court noted that misrepresentation actions, the common-law predecessor of

securities fraud actions, required that a plaintiff "show not only that had he

known the truth he would not have acted but also that he suffered *actual*

*economic loss*."  <u>Dura</u>, 544 U.S. at 343-44 (emphasis added).  The Court went on

to emphasize that the PSLRA "expressly imposes on plaintiffs 'the burden of

proving' that the defendant's misrepresentations 'caused *the loss for which the*

*plaintiff seeks to recover*,'" making clear Congress' intent to permit such

recovery only where "plaintiffs adequately prove the traditional elements of

causation *and loss*." <u>Id.</u> at 346 (emphases added and citation omitted).

Therefore, the Court indicated that a plaintiff could not effectively establish loss

causation without providing some rough measure of the loss itself.  <u>See</u> <u>id.</u> at

348.  As such, a determination of the substantiality of the fraudulent conduct's

effect requires some measurement of the loss attributable to that conduct.

     Having reviewed the jurisprudence of neighboring circuits, the Court finds

persuasive the position of the Second Circuit that in order to defeat summary

judgment, plaintiffs in a securities fraud case must present evidence disaggregating the fraud and non-fraud-related causes of the plaintiff's loss. This rule accords with recent decisions of this court utilizing the Second Circuit's disaggregation approach at the pleading stage.  See Waterford Township General Employees Retirement System, Individually and on Behalf of All Others Similarly Situated v. Suntrust Banks, Inc.,  No. 1:09-CV-617-TWT, 2010 WL 3368922, at * 4 (N.D. Ga. Aug. 19, 2010) (finding that plaintiffs failed to apportion the loss among the multiple factors that ultimately destroyed plaintiffs' investment); In re HomeBanc Corp. Sec. Litig., 706 F. Supp. 2d 1336, 1361-62 (N.D. Ga. 2010) (finding insufficient a complaint that failed to make any allegations distinguishing losses caused by defendant's alleged misrepresentations from those caused by industry-wide factors).

This approach is also consistent with the Robbins rule as modified by Dura.  Merely showing that multiple forces act upon an object is insufficient to show that a particular force was any more substantial than the others.  Plaintiffs must provide the fact-finder with a basis for evaluating the relative effects of competing causes of a loss, thereby determining which factors were substantial

89

and which were relatively minor or inconsequential.[11]  Accordingly, where

several competing factors may have resulted in a decline in the plaintiff's loss,

the plaintiff must provide sufficient evidence to apportion the loss between

fraud-related and non-fraud-related causes.  Such an analysis requires the

plaintiff's expert to disentangle the effects of the alleged fraud from both

industry-wide information and company-specific information unrelated to such

fraud.  See Vivendi, 605 F. Supp. 2d at 591.

Defendants assert that even if S-A's July 19 and August 16 statements

constitute corrective disclosures, Plaintiffs have not disaggregated the

information relating to the alleged fraud from other factors affecting the stock

price on those days.  In particular, Defendants point to two competing causes:

---

[11]  Furthermore, an overly permissive reading of the substantiality requirement, allowing a plaintiff to establish loss causation without disaggregating other potential causes, would risk subjecting the parties to needless, protracted litigation only to reach the same result.  The Fourth Circuit decision in Miller v Asensio provides a cautionary example.  In that case, the jury concluded that the plaintiff proved that the defendant's fraud constituted a substantial cause of the plaintiff's injury under the loss causation inquiry, but that the plaintiff failed to provide any mechanism for discerning the portion of the injury solely attributable to the defendant's fraud under the damages inquiry.  See Miller v. Asensio & Co., Inc., 364 F.3d 223, 232-33 (4th Cir. 2004).  On review, the Fourth Circuit upheld the verdict finding liability but awarding zero damages.  See id. at 235.  Nothing would be gained by permitting such an outcome in the present case, especially when considering the fact that the vast sums expended by both parties over several years of litigation are likely to pale in comparison to the expenses the parties would incur should this case proceed to trial.

(1) the impact of several industry-wide factors upon S-A and its competitors; (2) S-A's discussion of how such industry-wide factors would have specifically affected its operations.

As noted above, the July 19 and August 16 disclosures discussed several factors aside from excess customer inventories that contributed to S-A's fourth quarter performance and revisions to its guidance for FY 2002. These factors included the uncertain economic climate, reduced digital marketing efforts by cable operators during the summer, and the unexpectedly slow deployment of interactive applications associated with digital cable. In the days following the July 19 disclosure, several analysts discussed the impact of these confounding factors, attributing S-A's declines partially to the slowdown in the economy as well as the delayed deployment of interactive applications. (SOF ¶ 253.)

Plaintiffs have sufficiently accounted for the contributing industry-wide factors in their analysis. As Plaintiffs note, the existence of these confounding factors was not new information to the market on July 19. (Opp Br. at 103-11.) A number of analyst reports pre-dating S-A's corrective disclosures had discussed the risks to S-A's business posed by a softening economy:

91

- An April 20, 2001 report from Kaufman Brothers stated that "Scientific-Atlanta's results are certainly impressive in the wake of a communications equipment market that is seemingly screeching to a halt."  (SMF ¶ 39c.)

- An article in Cable World from May 28, 2001 noted skepticism about whether S-A's Explorer 8000 would "become a must-have, especially during an economic slowdown." (SMF ¶ 39d.)

- A June 13, 2001 report from Josephthal & Co. Inc. noted "the impact of a slowing economy on subscriber addition rates for digital TV service," while also praising S-A's strong earning performance as compared to other companies.  (SMF Ex. 39e.)

Likewise, analysts had discussed the potential delays in the deployment of interactive applications, although the tone of these discussions suggests measured skepticism about the pace of such deployments rather than solid predictions concerning their impact upon S-A:

- An April 4, 2001 report from  Deutsche Bane Alex. Brown Inc. noted that while there was "strong European support for interactive

services, we remain concerned that US progress will be slow this year."

- A May 14 report from Wachovia Securities discussing a seminar on the cable television industry noted that "2001 deployment plans [for video-on-demand] are far from complete," while also reporting that the video-on-demand service "was discussed with enthusiasm by all panel members."

- A June 14 report from Thomas Weisel Partners noted that North American cable operators were "not yet focused on [interactive] applications" and that such applications would "wait until next year."

(SMF ¶ 41a, b; SMF Ex. 40d.)  In addition, at least one July 17 report mentioned the effect of reduced digital marketing efforts during the summer prior to S-A's July 19 disclosures.  (SMF ¶ 44a.)  As such, Plaintiffs have presented an issue of fact as to whether the market was aware of the potential effect of these industry-wide factors prior to the July 19 and August 16 disclosures.

In a similar vein, Plaintiffs correctly argue that to the extent that these confounding factors affected the industry as a whole, Dr. Hakala's event study in

93

the present case accurately accounts for these factors through the use of an industry index. (Pl. Opp. at 111-12.) In his analysis, Dr. Hakala employed a composite index comprised of reported information regarding eight companies with similar business models to S-A's, as well as a broader industry index. When calculating losses, Dr. Hakala determined the extent to which S-A's stock price differed from a "true value" price that was calculated using the composite index, which accounted for market-wide factors as a matter of course. In the days following S-A's July 19 disclosures, this composite index remained relatively steady, while S-A's share price dropped dramatically. (Hakala Report Ex. B-3: Scientific-Atlanta's Share Price Compared with Composite Index Over the Event Study Period.) This evidence indicates that S-A experienced a drop in share price as a result of its July 19 disclosure.

However, Plaintiffs fail to address Defendants' critical point that in the July 19 and August 16 statements, S-A confirmed that the pre-existing, industry-wide factors had impacted it specifically during the fourth quarter. Analyst reports prior to S-A's disclosures discussed the potential effect of the slowing economy, delays in the deployment of interactive services, and seasonality in

94

MSO marketing efforts, and Dr. Hakala's analysis accounts for the effect of such reports on the industry as a whole as compared to S-A.

What was new to the market on July 19 was S-A's confirmation that these factors had in fact impacted S-A's business.  Previous discussions of these industry-wide factors with respect to S-A tended to mix measured skepticism – as in the Cable World article mentioning the potential effects of an economic slowdown – with optimistic appraisal of S-A's resistance to these trends.  The April 20 Kaufman Brothers report characterized S-A's sales as impressive in light of the downward trends in the overall market.  The June 13 Josephthal & Co. report likewise praised S-A's "stellar" performance as compared to other companies that were reporting "declining asset turnover."

These optimistic appraisals clashed sharply with S-A's July 19 disclosures, which mentioned at several points the impact of the slowing economy.  The July 19 statements focused in particular on the lack of historical data that would have allowed S-A to gauge the "sensitivity of demand to changes in the economy," as well as the declining economy's adverse effect upon "consumer purchases of new digital services, and thus purchases of the company's digital products by the MSO's."  (SOF ¶ 252.)

95

Moreover, in the days following the July 19 disclosures, analysts frequently cited to the effect of the weakened economy upon S-A's sales as frequently or more often than other factors affecting S-A's growth, including inventory issues:

- Kaufman Brothers, July 19: "Based on the slower growth prospects for digital subscriber additions among domestic MSOs, a heightened risk of industry consolidation that could curb spending in the near term, and *softening economic conditions* lead us to cut our estimates for FY02 . . . ."

- ABN AMRO, July 20: "Subscriber bookings were down 6% . . . . Reasons for the slowdown include *uncertain economic climate* and order pushouts by MSOs  due to installation delays."

- Merrill Lynch, July 20: "Subscriber product bookings were down 6% . . . .  This decline is owing to the *current macroeconomic environment*, customer inventory levels, and slower-than-expected deployment of interactive applications. . . . *[T]he company's overall performance in [transmission] was affected by a softening economy.*"

96

- Wells Fargo, July 20: "A slowdown in the rollout of digital cable services by cable operators -- *due to slowing economy*, slow rollout of interactive services, inventory adjustments, and seasonal factors -- began in the June quarter and is expected to continue into the next calendar year."

(SOF ¶ 253 (emphases added).)

Other analyst reports downplayed the role of customer inventory levels while focusing more heavily on other confounding factors.  Although a report from Deutsche Bank Alex Brown discussed customer inventory levels (along with the softening economy and decreased demand for digital cable), the report characterized S-A's July 19 statements as attributing the disappointing fourth quarter to "global economic weakness and seasonal factors." (SOF Ex. 105.)

In addition, at least one report omitted discussions of inventory levels altogether, focusing more on S-A's discussion of how unexpectedly slow deployment of interactive applications impacted the demand for digital set-top boxes:

Reducing Rating to Buy from Strong Buy Due to Estimates Reduction, Uncertainty of Market Acceptance of Interactive Applications, *and Above*

97

> *All, Likely Slowing Demand for Digital Cable in North America.* . . . Our
>
> main reason for our downgrade is *new information that the demand for*
>
> *digital cable is slowing in North America.* . . . Management stated that
>
> they believed set top box shipments were down sequentially because cable
>
> MSOs had not deployed interactive applications, which would drive
>
> demand for digital set top boxes, and industry seasonality where people do
>
> not watch as much TV in summer months.

(SOF Ex. 109.)

Given the change in analysts' tone from cautious optimism about S-A's strength relative to the weakening economy prior to July 19 to definitive statements about the adverse effect of the economy and other industry-wide factors following the July 19 disclosure, the evidence suggests that S-A's July 19 discussion of these confounding factors played some role in the decline of S-A's stock.  As in Omnicom, this new characterization of previously-known information presents a confounding factor, the effect of which Plaintiffs have failed to isolate.

While Plaintiffs have proffered evidence that the market reacted negatively to the July 19 disclosures, Dr. Hakala's analysis fails to disentangle

the effect of the new information regarding customer inventory levels from S-A's new, negative characterization of how industry-wide trends were affecting it specifically.  As noted in Omnicom, such a partial disaggregation of confounding factors is insufficient to establish that the alleged misrepresentations actually caused Plaintiffs' loss. See Omnicom, 541 F. Supp. 2d at 554.  Furthermore, Plaintiffs' sole argument on this point echoes the failed position of the Omnicom plaintiffs, i.e., that the issues discussed had previously been identified in analyst and news reports.  See id.  As such, this failure to acknowledge the effect of S-A's public statements regarding the company-specific effect of market-wide trends is likewise fatal to Plaintiffs in the present case.

Therefore, the record evidence provides no method by which a jury can determine how much, if any, of Plaintiffs' loss is attributable to Defendants' failure to disclose its alleged channel stuffing activities.  At best, a jury could determine that S-A's fraudulent conduct was a factor in Plaintiffs' loss, but would have no basis for concluding that such conduct was a *substantial* factor. As Plaintiffs are unable to satisfy the Robbins standard on loss causation with

AO 72A
(Rev.8/82)



respect to their claims of channel stuffing, Defendants' motion for summary

judgment is due to be granted.[12]

---

[12] Defendants also contend that Plaintiffs, by improperly including inflation caused by alleged misrepresentations prior to the start of the class period, fail to determine the portion of S-A's price inflation that is properly attributable to misrepresentations during the class period.  However, Plaintiffs argue persuasively that the class period inflation includes not only the price increase in response to S-A's January 2001 statements, but also the pre-class period inflation that would have been removed from the stock price had S-A accurately provided information about demand for its products and how it was generating sales.  Other courts considering this question have endorsed such a theory of recovery on 10b-5 claims.  See In re Bristol-Myers Squibb Sec. Litig., No. Civ.A. 00-1990 (SRC), 2005 WL 2007004, at *17 (D.N.J. Aug. 17, 2005) ("Logic suggests that if a material omission serves to conceal information that would otherwise cause the stock price to fall, the very fact that the price does not change (until corrective disclosure) would evince the statement's materiality."); Swack v. Credit Suisse First Boston, 383 F. Supp. 2d 223, 240 (D. Mass. 2004) ("Defendants' conduct could have tempered a drop in price that would otherwise have occurred, or resulted in a greater increase than the stock would otherwise have enjoyed, absent the deceptive analyst reports.").  As Dr. Hakala's report quantifies both the inflation added as well as the inflation maintained by Defendants' alleged misrepresentations, the inclusion of such pre-class period inflation provides no basis for a grant of summary judgment.  (Pl. Opp. at 99; Hakala Report at 37.)  Nonetheless, the point is moot in light of Plaintiffs' failure to otherwise establish loss causation.

## Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment [412, 420] is **GRANTED**.  Defendants' Motion to Strike and Motion in Limine Concerning Inadmissible Evidence of Collateral Government Proceedings [439, 445] is **DENIED** as moot, with leave to re-file as necessary.

**SO ORDERED**, this __18th__ day of November, 2010.


_____
**RICHARD W. STORY**
United States District Judge

101