[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-15910

_____

D. C. Docket No. 1:01-cv-01950-RWS

ROCHELLE PHILLIPS, on behalf of herself and
all others similarly situated,
KALFORD C. FADEM, et al.,

                                                    Plaintiffs-Appellants,

versus

SCIENTIFIC-ATLANTA, INC.,
WALLACE G. HAISLIP, et al.,

                                                    Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(September 6, 2012)

Before WILSON, KRAVITCH and EDMONDSON, Circuit Judges.


PER CURIAM:

This appeal is from the grant of summary judgment to Defendants.  The case involves allegations of securities fraud -- a fraud on the market -- brought by private parties as part of a putative class action.  Claims under the Securities Exchange Act of 1934 ("the Exchange Act") and Rule 10b-5 as promulgated thereunder are involved.

Plaintiffs contend that Defendant Scientific-Atlanta, Inc. and certain members of the company's senior management issued materially false and misleading statements during the class period; that these statements caused Plaintiffs to purchase S-A securities at artificially-inflated prices; and that Plaintiffs experienced losses on their investments when S-A issued certain "corrective disclosures" in 2001.  The district court granted summary judgment for Defendants based solely on Plaintiffs' failure to present sufficient evidence of "loss causation."  We affirm the judgment.


BACKGROUND


Defendant Scientific-Atlanta, Inc. ("S-A")  manufactures and sells products -- such as digital set-top boxes -- for use in the cable television industry. Defendants Wallace G. Haislip and James F. McDonald  were S-A's CFO and

2

CEO (together with S-A, "the Defendants").  This case pertains to S-A's financial performance in fiscal year 2001 (July 2000 to June 2001) and to certain statements made by the Defendants during the putative class period about S-A's financial performance.

In a nutshell, Plaintiffs' complaint contended that the Defendants engaged in "channel stuffing"[1] to cover up decreasing demand for S-A's products; that Defendants issued  materially false and misleading statements as part of the purported cover-up; that Plaintiffs relied upon these statements in purchasing their S-A securities; and that the eventual disclosure of the truth in Defendants' later-issued "corrective disclosures" caused the price of Plaintiffs' S-A securities to fall and caused Plaintiffs to experience losses on their investments.

Plaintiffs' complaint contended that, even while S-A performed very well in the first fiscal quarter of 2001, S-A management became aware (and continued to learn over the course of the fiscal year) that various sales metrics for S-A products

---

[1]Broadly speaking, "channel stuffing" is the practice of pulling  sales from future fiscal periods into the present fiscal period -- by way of encouragement, discounts, or incentives -- to increase current fiscal period performance: taking from the future to embellish the present. While "channel stuffing" is not per se illegal or fraudulent, it "may amount to fraudulent conduct when it is done to mislead investors." Garfield v. NDC Health Corp., 466 F.3d 1255, 1262 (11th Cir. 2006).  One particular way "channel stuffing" can mislead investors is by creating the impression that sales for a product are strong, and will continue to be strong, when -- in fact -- "stuffed" product is stacking up at customers; and the product backlog will likely cause a slowing of future orders.

were declining or trending lower.  Plaintiffs allege that Defendants responded by using discounts, warehousing credits, unusually liberal return policies, and extended repayment terms to bring sales of cable equipment to cable companies -- referred to as Multiple System Operators ("MSOs") -- into earlier fiscal quarters and to hide the evidence of slowing sales and orders from shareholders, like Plaintiffs.

Plaintiffs' complaint contended that the alleged "channel stuffing" in this case was done specifically to hide a decrease in sales and orders from shareholders and to mislead investors about the company's strength and performance.  In addition, Plaintiffs' complaint contended that Defendants -- despite knowing that non-channel-stuffed sales were falling and that customer inventory was increasing -- made materially false and misleading statements about S-A's financial performance  during the second and third fiscal quarters, failed to disclose the slowdown in order volume, and failed to disclose the "channel stuffing" efforts being undertaken to advance sales from future fiscal quarters into S-A's second and third fiscal quarters.

The series of allegedly materially false and misleading statements identified by Plaintiffs began on 18 January 2001 -- the start of the purported class period -- with an S-A press release announcing "record financial results" for the second

fiscal quarter of 2001 and a press release announcing an increase in manufacturing capacity "in response to the continuing acceleration in customer demand."  In an earnings-related conference call with analysts and the media, Defendant Haislip forecasted to the public continued growth in the set-top box business and subscriber sales in general.  This tone continued when S-A issued a press release, in April 2001, reporting a large year-over-year increase[2] in sales in the third fiscal quarter and when Defendant McDonald -- in a pair of interviews with the financial media -- described rising customer demand and predicted strong performance  in the upcoming fourth fiscal quarter.

Plaintiffs' complaint contended that the fraud was only revealed to the public in July and August 2001.  In July 2001, when S-A reported its fourth fiscal quarter results, it announced that sales had decreased during the fiscal quarter.  S-A attributed the year-over-year decline in total bookings for the fourth quarter to "the uncertain economic climate and reduced digital marketing efforts by cable operators during the slower summer vacation period, in addition to customer inventory levels and the slower than expected deployment of interactive applications." In an earnings-related conference call with analysts and the media,

---

[2]Used here, "year-over-year increase" means an increase from the previous year's third fiscal quarter to the pertinent third fiscal quarter.  This concept is different from an increase from one fiscal quarter to the next fiscal quarter that immediately, temporally follows.

Defendant McDonald attributed part of the announced decline in new orders to the absorption of inventory by MSOs. After these announcements, S-A's stock price fell steeply.

The last of the alleged "corrective disclosures" was made on 16 August 2001 -- the end of the purported class period -- when S-A filed its Form 10-K for fiscal year 2001 with the SEC.  The 10-K reported reduced demand for S-A's products and noted the impact of customers having accumulated inventory.  In a related press release, Defendant Haislip stated that S-A anticipated adverse impacts in the next fiscal year and attributed the decline in demand for S-A products to the slowing economy and to the effect of a correction in customer inventory levels.  After these announcements, S-A's stock price again fell steeply.

The district court denied Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and Rule 9(b) of the PSLRA (requiring the pleading of fraud with particularity); allowed discovery; and then granted Defendants' Motion for Summary Judgment. The summary judgment was based on Plaintiffs' having failed to demonstrate a genuine issue of material fact about "loss causation."  The district court explained that Plaintiffs' failure "to disentangle the effect of the new information regarding customer inventory levels from S-A's new, negative characterization of how industry-wide trends were affecting it specifically" was

"fatal" to Plaintiffs' case: "the record evidence provides no method by which a jury can determine how much, if any, of Plaintiffs' loss is attributable to Defendants' failure to disclose its [sic] alleged channel stuffing activities."

DISCUSSION

"Private federal securities fraud actions are based upon federal securities statutes and their implementing regulations," as interpreted by the courts. And "[i]n cases involving publicly traded securities and purchases or sales in public securities markets, the action's basic elements include: (1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." Dura Pharms., Inc. v. Broudo, 125 S. Ct. 1627, 1631 (2005) (citations omitted) (emphasis omitted); see also Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1236-37 (11th Cir. 2008).

The district court determined that Plaintiffs had presented genuine issues of material fact on all of the required elements of their claim, except for "loss causation." While a genuine issue of material fact must exist for each element of a

claim to overcome a motion for summary judgment, we need only address the

"loss causation" element here because our decision on that element -- reviewing

the record <u>de</u> <u>novo</u> -- determines the outcome of this case.

About "loss causation" in fraud-on-the-market cases (like this case), we

have said that "[t]he loss causation element of a Rule 10b-5 claim requires that the

defendant's fraud be both the but-for and proximate cause of the plaintiff's later

losses[:]" at least a "'substantial' or 'significant contributing cause.'"[3] <u>FindWhat</u>

<u>Investor Group v. FindWhat.com</u>, 658 F.3d 1282, 1309 (11th Cir. 2011) (quoting

<u>Robbins v. Kroger Properties, Inc.</u>, 116 F.3d 1441, 1447 (11th Cir. 1997)).  This

principle means that, where plaintiffs in fraud-on-the-market cases attempt to

demonstrate loss causation circumstantially by identifying a "corrective

disclosure" and "showing that the stock price dropped soon after the corrective

disclosure," plaintiffs must also "eliminat[e] other possible explanations for this

price drop, so that the factfinder can infer that it is more probable than not that it

---

[3]A "fraud on the market" theory of causation in securities cases is based on the idea that the pertinent securities market is "efficient" and properly prices in -- that is, takes right account of -- all available material information for the prices of its securities.  In such a market, a material misrepresentation disseminated into the market will be translated into the price of all relevant securities.  Likewise, when the misrepresentation is revealed for its true nature, the market will remove the effect of the misrepresentation from the price of the relevant securities. In the case of misrepresentations that positively impacted on the price of certain securities, the later revelation will cause a drop in price and a loss for anyone who purchased the securities when the price was elevated based on the positive misrepresentation.   For further background, <u>see</u> <u>FindWhat</u>, 658 F.3d at 1309-10.

was the corrective disclosure -- as opposed to other possible depressive factors --
that caused at least a 'substantial' amount of the price drop." Id. at 1311-12.

The press releases and interviews that Plaintiffs have identified as
presenting the "corrective disclosures" in this case include multiple pieces of non-
fraud-related information (for example, the uncertain economic climate, reduced
marketing by S-A's customers, unexpectedly slow deployment of interactive
digital cable services) that qualify as "other possible depressive factors":
revelations not about the supposed "channel stuffing." The other factors could
have caused some amount of the identified price drop.  Absent sufficient
disaggregation of the relative price effects of these different pieces of information,
no fact-finder would be able to determine that the revelation of the supposed
"channel stuffing" activities in this case satisfied the pertinent causation
requirement.

In opposing summary judgment, Plaintiffs offered the expert report and
deposition of Dr. Scott Hakala.  Dr. Hakala's report included an "event study" and
other analysis that attempted to disaggregate the effects of some of the
confounding factors.

Dr. Hakala sufficiently accounted for "industry-wide" confounding factors
-- such as the general slowing economy and the reduced digital marketing efforts

made by cable operators during the slower summer vacation period -- through the use of an industry index and his analytics.  In effect, he separated (and dropped out of pricing consideration)  S-A statements -- in their entirety (that is, information related to the supposed fraud, as well as other information affecting stock price) -- from general industry factors.  And then Dr. Hakala concluded that general industry factors alone could not explain the price decline.  But he did not disaggregate (and made no attempt to disaggregate) the impact of Defendants' statements that accurately presented the industry-wide factors that had -- in fact -- specifically impacted on S-A during the fourth fiscal quarter.

S-A's new, negative characterization of how industry-wide trends and the generally slowing economy were affecting it specifically during the fourth fiscal quarter of 2001 was new information when released to the market in July 2001 and August 2001: confounding information.  And analyst reports that came out after pertinent releases included at least some discussion of this new impact of industry trends and the weakened economy on S-A.  Given that the impact of this new, confounding information -- an "other possible depressive factor" -- was not disaggregated at all by Plaintiffs, no basis exists in the record by which any fact-

finder could sufficiently determine that the revelation of the supposed "channel stuffing" in this case satisfied the pertinent causation requirement.[4]

CONCLUSION

We see no reversible error.  Plaintiffs have failed to eliminate sufficiently other possible explanations for the identified price drop.  We therefore conclude no genuine issue of material fact exists on "loss causation" -- a required element of Plaintiffs' claim -- and AFFIRM the grant of summary judgment to Defendants.

AFFIRMED.

---

[4]For the first time on appeal, Plaintiffs advance the argument that the new, negative characterization of how industry-wide trends and the slowing economy were affecting S-A specifically during the fourth fiscal quarter of 2001 was actually part and parcel with the revelation of the supposed "channel stuffing" activities; they say the new, negative characterizations need not be disaggregated because they are part of the revelation of the fraud. This argument -- that S-A's talk about industry trends impacting negatively on S-A specifically was a "new characterization" that was part of the fraud disclosure -- was not put to the district court. The district judge's job is to decide the case actually presented, based on the arguments actually and properly presented.  District judges are not obliged to tweezer out or imaginatively to reframe the parties' arguments. Because this argument was first raised on appeal and was not presented to the district court at summary judgment, we will not consider it now.  See, e.g., Ledford v. Peeples, 657 F.3d 1222, 1258 (11th Cir. 2011).

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

John Ley
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

September 06, 2012

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 10-15910-FF
Case Style: Rochelle Phillips, et al v. Scientific-Atlanta, Inc., et al
District Court Docket No: 1:01-cv-01950-RWS

Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the CRIMINAL JUSTICE ACT must file a CJA voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for a writ of certiorari (whichever is later).

Pursuant to Fed.R.App.P. 39, costs taxed against the appellants.

The Bill of Costs form is available on the internet at www.ca11.uscourts.gov

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Janet K. Spradlin, FF at (404) 335-6178.

Sincerely,

JOHN LEY, Clerk of Court

Reply to: Djuanna Clark
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs